# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BUZZFEED MEDIA ENTERPRISES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 2023-0377-MTZ |
| v. | ) | |
| | ) | |
| HANNAH ANDERSON, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: November 20, 2023
Date Decided: May 15, 2024

Rolin P. Bissell, Elena C. Norman, Kevin P. Rickert, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Mary Eaton, Thomas Walsh, Christian Vandergeest, FRESHFIELDS BRUCKHAUS DERINGER US LLP, New York, New York, *Attorneys for Plaintiff*.

David A. Felice, BAILEY & GLASSER LLP, Wilmington, Delaware; Kevin D. Galbraith, THE GALBRAITH LAW FIRM, New York, New York; Sean R. O'Brien, A.J. Monaco, O'BRIEN LLP, New York, New York; Joseph Gallagher, HARRIS ST. LAURENT & WECHSLER LLP, New York, New York, *Attorneys for Defendants*.

ZURN, Vice Chancellor.

This opinion resolves whether former employees of BuzzFeed Inc. ("OldCo") may demand that OldCo's successor in interest, BuzzFeed Media Enterprises, Inc. ("BME" or "Plaintiff"), arbitrate the employees' claims under the mandatory arbitration provisions in their employment agreements with OldCo (the "EAs"). This is the second time this Court has addressed the arbitrability of the employees' claims.[1] The first time, ninety-one OldCo employees (the "Employees" or "Defendants") sought to compel arbitration against nonsignatories to the EAs.[2] In an opinion referred to here as *BuzzFeed I*, the Court held the OldCo EA arbitration provisions were not binding on those nonsignatories.[3] The Employees then amended their arbitration demand to proceed against BME instead. BME filed this action to permanently enjoin the Employees from proceeding with arbitration.

The Employees moved to dismiss BME's suit under Court of Chancery Rule 12(b)(1). BME seeks a judgment barring the Employees' arbitration claims, arguing the EAs do not govern the dispute, and the agreements that do govern lack arbitration provisions.

This opinion concludes that the Employees' claims rely on the EAs alone, that the EAs clearly and unmistakably delegate the question of arbitrability to the

---

[1] *See BuzzFeed, Inc. v. Anderson* (*BuzzFeed I*), 2022 WL 15627216 (Del. Ch. Oct. 28, 2022).

[2] *See id.* at \*9–14.

[3] *See id.* at \*1, \*21.

arbitrator, and that no other agreement presents a conflict with the EAs' arbitration provision that this Court can resolve. As for the eighty-five Employees who have produced an EA (the "EA Defendants"), I grant their motion to dismiss.

But six of the Employees (the "Six Employees") have not produced an EA or any agreement to arbitrate, and have not provided parol evidence establishing an agreement to arbitrate. The Employees' motion to dismiss is denied as to those Six Employees, and so is BME's motion for summary judgment.

## I. BACKGROUND

What follow are the facts relevant to the pending motions.[4] Readers seeking more background information are referred to *BuzzFeed I*.[5]

---

[4] For purposes of the pending motions, I draw the following facts from the verified complaint and the documents attached or integral to it, and admissions on file, together with any affidavits, and public filings. *See*, *e.g.*, *Himawan v. Cephalon, Inc.*, 2018 WL 6822708, at *2 (Del. Ch. Dec. 28, 2018); *In re Rural Metro Corp. S'holders Litig.*, 2013 WL 6634009, at *7 (Del. Ch. Dec. 17, 2013) ("Applying [Delaware] Rule [of Evidence] 201, Delaware courts have taken judicial notice of publicly available documents that are required by law to be filed, and are actually filed, with federal or state officials."); Ct. Ch. R. 56(c). Citations in the form of "Compl." refer to Plaintiff's Verified Complaint for Declaratory and Injunctive Relief, available at docket item ("D.I.") 1; citations in the form of "POB" refer to Plaintiff's Opening Brief in Support of Plaintiff's Motion for Summary Judgment, available at D.I. 24; citations in the form of "DOB" refer to Defendants' Opening Brief in Support of their Motion to Dismiss and Opposition to Plaintiff's Motion for Summary Judgment, available at D.I. 46; citations in the form of "PAB" refer to Plaintiff's Opposition to Defendants' Motion to Dismiss and Reply in Further Support of its Motion for Summary Judgment, available at D.I. 24; citations in the form of "DRB" refer to Defendants' Reply Brief in Support of their Motion to Dismiss, available at D.I. 51.

[5] 2022 WL 15627216 (Del. Ch. Oct. 28, 2022).

## A. The Employees' Employment Relationship With OldCo

"OldCo was a privately owned digital media, news, and entertainment company incorporated in Delaware," and it was Employees' employer.[6] Most Employees joined OldCo before 2014, when it was still a struggling startup.[7] They allege they signed the EAs that governed their employment relationship with OldCo, including their compensation.[8] Their compensation included OldCo Class B common stock options.[9] The Employees further allege they accepted below-market salaries "with the explicit understanding that the stock options" would fully compensate their service to OldCo upon a future OldCo merger or public offering.[10]

The EAs outline the stock options' approval and exercise process, along with the employment conditions necessary to trigger it, and state the options are "subject to the terms and conditions applicable to options granted under the Company's . . . Stock Plan . . . and the applicable Stock Option Agreement."[11]

---

[6] *Id.* at *2; *see* Compl. ¶ 2.

[7] D.I. 36, Ex. 2 Parts 1–3; D.I. 37, Ex. 2 Parts 4–6; D.I. 1, Ex. 2 ¶¶ 45, 49 [hereinafter "Am. Master Statement 1"].

[8] *See*, *e.g.*, D.I. 36, Ex. 2 Part 1 at Ex. 2.5 §§ 2, 4 [hereinafter "First EA"] ("Subject to the approval of the Company's Board of Directors or its Compensation Committee, [the employee] will be granted an option to purchase 1,500 shares of the Company's Common Stock (the 'Option').").

[9] *See* First EA § 4; Am. Master Statement 1 ¶ 46; Compl. ¶¶ 2, 41.

[10] Am. Master Statement 1 ¶ 3.

[11] First EA § 4.

Each EA contains a mandatory arbitration provision requiring "any and all claims or disputes arising out of [the EA] or relating to . . . employment with the [c]ompany" to be arbitrated before a neutral arbitrator "in accordance with the National Rules for the Resolution of Employment Disputes of the American Arbitration Association [("AAA")]."[12] EAs dated between 2011 and 2016 (the "First EAs") contain identical arbitration provisions stating claims or disputes subject to arbitration include "(but [are] not limited to) . . . breach of contract, breach of covenant of good faith and fair dealing, . . . , or claims regarding commissions, stock options or bonuses."[13] Three EAs executed in 2017, 2018, and 2020 (the "Second EAs") contain arbitration provisions that do not expressly mention stock

---

[12] *See*, *e.g.*, First EA § 10; *see also* D.I. 36, Ex. 2 Part 1 at Ex. 2.2 § 10 [hereinafter the "Second EA"] (agreeing to "binding arbitration under the auspices of the American Arbitration Association in accordance with its then current Employment Arbitration Rules and mediation procedures").

[13] First EA § 10.

options or bonuses."[14]  Each EA requires the costs of arbitration to be shared equally

between the employee and OldCo.[15]

As for the "applicable Stock Option Agreement" mentioned in the EAs (the

"OAs"), three versions are in play.  One version covers most of the employees'

option grants, spanning from 2008 through 2016 (the "2008 OA");[16] another version

covers one employee's option grant in January 2015 (the "January 2015 OA");[17] and

another version covers option grants from November 2015 through 2020 (the

"November 2015 OA").[18]  Some employees entered into more than one version.[19]

All three have a Delaware choice of law provision.[20]  Neither the 2008 OA nor the

---

[14] Second EA § 10 ("In the event of any dispute or claim relating to or arising out of [the] employment relationship, both [the employee] and the Company agree to submit such claim to binding arbitration under the auspices of the American Arbitration Association in accordance with its then current Employment Arbitration Rules and mediation procedures . . . .  This arbitration provision includes all contractual, common-law and statutory claims, including all claims that the Company may have against [the employee], as well as all claims that [the employee] may have against the Company (including the Company's affiliates, officers, directors and employees)."); *see also* D.I. 36, Ex. 2 Part 3 at Ex. 2.28 § 10 (mirroring the Second EA); D.I. 36, Ex. 2 Part 3 at Ex. 2.29 § 10 (mirroring the Second EA).

[15] First EA § 10; Second EA § 10.

[16] *See*, *e.g.*, D.I. 35, Ex. 3.79.

[17] *See* D.I. 35, Ex. 3.86.

[18] *See*, *e.g.*, D.I. 34, Ex. 3 Part 12 at Ex. 3.77 at ES-2512 Stock Option Agreement.

[19] *See id.*; *id.* at 08-098 Stock Option Agreement (providing the 2008 OA).

[20] D.I. 35, Ex. 3.79 at Stock Option Agreement § 13(e); D.I. 35, Ex. 3.86 at Stock Option Agreement § 13(d); D.I. 34, Ex. 3 Part 12 at Ex. 3.77 at ES-2512 Stock Option Agreement § 7.

January 2015 OA contains a forum selection clause.[21] The November 2015 OA has a New York forum selection clause.[22] Each OA contains a nearly identical integration clause.[23]

### B. The Merger

On June 24, 2021, OldCo and 890 5th Avenue Partners, Inc. publicly announced their plans to merge. The transaction closed on December 3, 2021.[24] The surviving entity, an 890 5th Avenue Partners subsidiary, was renamed BME; and 890 5th Avenue Partners was renamed as the entity this opinion refers to as Parent. BME assumed all of OldCo's liabilities and remained Parent's direct and wholly owned subsidiary.[25]

---

[21] *See*, *e.g.*, D.I. 35, Ex. 3.79; D.I. 35, Ex. 3.86.

[22] *See*, *e.g.*, D.I. 34, Ex. 3 Part 12 at Ex. 3.77 at Stock Option Agreement § 14.7 ("For purposes of litigating any dispute that may arise directly or indirectly from this [a]greement, the parties hereby submit and consent to the exclusive jurisdiction of the State of New York and agree that any such litigation shall be conducted only in the courts of New York or the federal courts of the United States located in New York and no other courts.").

[23] *See* D.I. 34, Ex. 3 Part 12 at Ex. 3.76 at Stock Option Agreement § 13(d) ("The Notice of Stock Option Grant, this Agreement, and the [Stock] Plan constitute the entire contract between the parties hereto with regard to the subject matter hereof. They supersede any other agreements, . . . that relate to the subject matter hereof."); *id.* at Ex. 3.77 at Stock Option Agreement § 14.4.2 ("The [Stock] Plan, the Grant Notice and the Exercise Agreement are each incorporated herein by reference. This Agreement, the Grant Notice, the [Stock] Plan and the Exercise Agreement constitute the entire agreement of the parties with respect to the subject matter hereof and supersede all prior undertakings and agreements with respect to such subject matter.").

[24] Compl. ¶ 29.

[25] *Id.* ¶¶ 12, 35.

Each share of OldCo Class B common stock was canceled and converted into the right to receive prorated Class B common stock in Parent.[26] Parent Class B shares are not publicly traded, but a mechanism existed for converting them into publicly traded Parent Class A shares.[27]

On December 6, Parent Class A shares commenced public trading at $10.95 per share. That day, the price reached as high as $14.77 and closed at $8.56.[28] The Employees allege "they were locked out of the market until the share price had dropped to . . . $4.25 per share."[29] Thus, the Employees argue they were damaged because "they were unable to convert their [Parent] Class B Shares into [Parent] Class A Shares in time to profitably participate in the IPO, or in some cases, to trade at all."[30]

### C. The Employees Initiate Arbitration; Parent Responds With Litigation.

The Employees filed arbitration claims with AAA as a mass claims arbitration action.[31] In total, ninety-one former employees submitted individual claims stating facts unique to each employee, which accompanied a master statement providing

---

[26] *Id.* ¶ 23.

[27] Am. Master Statement 1 ¶ 93.

[28] Compl. ¶ 30.

[29] Am. Master Statement 1 ¶ 100.

[30] *BuzzFeed I*, 2022 WL 15627216, at *4 (citations omitted).

[31] Compl. ¶¶ 1, 31.

facts and claims common to each employee's claim.[32] The first mass claims arbitration was brought against Parent, three of its officers, Parent's executive chairman, and Continental Stock Transfer Corp. (the "Transfer Agent") for its role as the transfer agent in the merger.[33] The master statement and individual statements relied on each claimant's EA's mandatory arbitration provision, the AAA's Employment Arbitration Rules, and the Supplementary Rules for Multiple Case Filings.[34]

In response, Parent and its fiduciaries filed a complaint in this Court on April 13 seeking an anti-arbitration injunction and a declaration that the EAs did not bind Parent to arbitrate.[35] The *BuzzFeed I* plaintiffs established that BME, not Parent, is OldCo's successor in interest; so BME, not Parent, assumed OldCo's obligations and was bound by the EAs.[36] *BuzzFeed I* concluded the *BuzzFeed I*

---

[32] *Id.* ¶ 31 n.2; D.I. 1, Ex. 13; *id.* at introduction to master statement; D.I. 1, Ex 14 at introduction to master statement; *id.* at 27.

[33] D.I. 1, Ex. 13 ¶¶ 36–42; D.I. 1, Ex 14 ¶¶ 5–11.

[34] D.I. 1, Ex. 13 ¶ 43; D.I. 1, Ex. 14 at introduction to master statement; *see* D.I. 1, Exs. 11–12.

[35] *See* Compl. ¶ 33; *BuzzFeed I*, 2022 WL 15627216, at *5.

[36] *BuzzFeed I*, 2022 WL 15627216, at *8, *12–14; *see BuzzFeed, Inc. v. Anderson*, C.A. No. 2022-0357-MTZ, at 52 (Del. Ch. Aug. 5, 2022) (TRANSCRIPT) ("[OldCo] inherited its successor in interest as BuzzFeed Media Enterprises. As such, and as expressly set forth in the merger agreement, all of the rights, obligations, et cetera, of old BuzzFeed are now housed within BME, BuzzFeed Media Enterprises, not the parent company [Parent]. And that distinction is quite important."). In this action, BME has not disputed it is bound by the EAs. *See* D.I. 55 at 21–22.

plaintiffs were not bound by the EAs' arbitration provisions, and so it enjoined the Employees from pursuing arbitration against the *BuzzFeed I* plaintiffs.[37]

### D. The Employees Amend Their Arbitration Statements; BME Responds With Litigation.

On January 17, 2023, the Employees filed amended master and individual statements in a mass claims arbitration.[38]  This time, they asserted claims against BME as OldCo's successor in interest for breach of the EA, breach of the implied covenant, negligence, and misrepresentation.  They also brought a claim against the Transfer Agent for negligence.[39]

On March 21, AAA requested filing fees for the second mass arbitration from at least forty-six claimants.  BME's portion of the initial filing fee would have been $9,100.[40]

On March 29, BME turned to this Court.  In Count I, BME seeks a declaration that (i) this Court, not an arbitrator, has jurisdiction to determine whether Defendants' claims against it are arbitrable; (ii) BME is not bound to arbitrate the amended claims; and (iii) Defendants' amended claims are governed by Parent's

---

[37] *BuzzFeed I*, 2022 WL 15627216, at *1.

[38] Compl. ¶ 35; D.I. 1, Ex. 3 [hereinafter "Am. Master Statement 2"]; Am. Master Statement 1.

[39] Compl. ¶ 35; Am. Master Statement 1 ¶¶ 103–47; Am. Master Statement 2 ¶¶ 74–117. The second amended master statement conflates OldCo and BME, claiming they "are functionally the same company."  Am. Master Statement 2 ¶¶ 8 & n.1.

[40] First EA § 10; Second EA § 10; D.I. 46, Ex. H.

charter, which includes a Delaware forum selection clause.[41]  In Count II, BME seeks a permanent injunction barring Defendants from pursuing arbitration.[42]  On April 25, the parties agreed to stay the arbitrations pending the outcome of this action.[43]

On May 5, BME moved for summary judgment, and the Employees both moved to dismiss and answered the complaint.[44]  The Employees' motion to dismiss contends this Court lacks subject matter jurisdiction to decide whether their claims are arbitrable, as the EAs delegated that issue to the arbitrator.  BME's motion for summary judgment asserts six Employees have failed to produce an agreement to arbitrate, and that this Court must enjoin arbitration as to those six.[45]  Then, as to the remaining EA Defendants, BME argues that substantive arbitrability is for the Court and that the Employees' claims are not arbitrable.[46]  The parties briefed the motions, and I heard oral argument on November 20.[47]

---

[41] Compl. ¶¶ 58–62.

[42] *Id.* ¶¶ 63–67.

[43] D.I. 6.

[44] D.I. 16; D.I. 17; D.I. 18.

[45] POB 22–23, 47.

[46] *Id.* at 32–46.

[47] *See* D.I. 55.

11

## II. ANALYSIS

I begin with the Employees' motion seeking dismissal under Court of Chancery Rule 12(b)(1).[48]  Courts often entertain motions to dismiss in favor of arbitration under Rule 12(b)(1).[49]  "Rule 12(b)(1) is a suitable vehicle for raising . . . arguments about why a court should not exercise its jurisdiction,"[50] and such a motion will be granted where it appears that "as a matter of established doctrine" the Court should not exercise its jurisdiction.[51]

BME responded to the Employees' motion to dismiss with several arguments as to why it should not be compelled to arbitrate.  Two arguments focus on the text of the EAs' arbitration provisions.  First, the parties clash on the familiar issue of whether the arbitrator or this court should decide the arbitrability of the Employees' claims.  The Employees argue the EAs delegated that issue to the arbitrator.  BME contends the EAs' arbitration provisions do not delegate substantive arbitrability to

---

[48] Ct. Ch. R. 12(b)(1).

[49] *Friddle v. Moehle*, 2024 WL 493536, at *6 (Del. Ch. Feb. 8, 2024); *see Erving v. ABG Intermediate Hldgs. 2, LLC*, 2022 WL 17246320, at *2 (Del. Ch. Nov. 28, 2022) ("A motion to dismiss based on an arbitration clause goes to the court's subject matter jurisdiction over a dispute and is properly reviewed under Court of Chancery Rule 12(b)(1)."); *Rummel Klepper & Kahl, LLP v. Del. River & Bay Auth.*, 2022 WL 29831, at *4 (Del. Ch. Jan. 3, 2022).

[50] *Gandhi-Kapoor v. Hone Cap. LLC*, 307 A.3d 328, 342 (Del. Ch. 2023).

[51] *Id.* ("[Some Rule 12(b)(1)] defenses are subject-matter-jurisdiction adjacent in that they ask a court to decline to exercise the subject matter jurisdiction it otherwise has.  The court technically may not lack subject matter jurisdiction, but as a matter of established doctrine, the court should abstain from exercising subject matter jurisdiction.").

12

the arbitrator, as evidenced by several carveouts. This opinion concludes the provisions delegate substantive arbitrability to the arbitrator.

Next, BME contends the arbitration provision cannot force it to participate in a mass claims arbitration. This opinion concludes OldCo assented to rules allowing the arbitrator to conduct a mass claims arbitration and to determine the appropriateness of mass claims arbitration.

From there, BME zooms out to read the EAs together with the OAs and Parent charter. BME argues the fully integrated OAs displaced the EAs' arbitration provision, and argues the Employees' claims actually arise under the OAs. But read carefully, these arguments are not for the Court; they are substantive arbitrability arguments for the arbitrator.

Finally, BME focuses on the existence of an arbitration agreement with the Six Employees who have not produced EAs. BME rightly points out those Six Employees have not yet shown that OldCo assented to arbitrate their claims; the motion to dismiss in favor of arbitration is denied as to them. But their failure to prove assent to arbitrate at the pleading stage does not entitle BME to a summary judgment.

### A. The EAs' Arbitration Provisions

I begin with the eighty-five EA Defendants who provided arbitration agreements in their EAs, binding BME.[52] Contrary to BME's arguments, the EAs' arbitration provisions delegate substantive arbitrability to the arbitrator and reflects assent to mass claims arbitration.

#### 1. The EAs Clearly And Unmistakably Show An Agreement To Arbitrate Questions Of Substantive Arbitrability.

BME's argument based on the EAs' arbitration provision is a familiar one: that this Court, not an arbitrator, must decide the substantive arbitrability of the EA Defendants' claims.[53]

"The question of whether the parties agreed to arbitrate is generally one for the courts to decide and not for arbitrators."[54] But "[b]ecause whether a particular controversy is arbitrable is itself a type of controversy, parties can agree to arbitrate that issue through a delegation agreement."[55] "[C]ourts should not presume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable

---

[52] DOB 5; DRB 1–2; POB 1–2, 14–16; D.I. 36, Ex. 1.

[53] *See*, *e.g.*, POB 37–48; DOB 12–35.

[54] *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 79 (Del. 2006).

[55] *Fairstead Cap. Mgmt. LLC v. Blodgett*, 288 A.3d 729, 749 (Del. Ch. 2023); *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65 (2019) ("[T]he question of who decides arbitrability is itself a question of contract.").

14

evidence that they did so.'"[56] "When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract," and "in those circumstances, a court possesses no power to decide the arbitrability issue."[57]

A "clear and unmistakable intent to submit [substantive] arbitrability issues to an arbitrator' exists if an arbitration clause: (1) 'incorporates a set of arbitration rules that empower arbitrators to decide [substantive] arbitrability' and (2) 'generally provides for arbitration of all disputes' under *James & Jackson, LLC v. Willie Gary, LLC*."[58] Satisfaction of the first prong creates a heavy presumption that the parties intended to delegate substantive arbitrability.[59] The second prong asks whether that heavy presumption is overcome because the parties did not agree to arbitrate generally all disputes.[60] To maintain the presumption, an arbitration agreement does not need to delegate "*all* cases" to arbitration; it must only *generally* provide for

---

[56] *Willie Gary*, 906 A.2d at 79 (quoting *DMS Properties–First, Inc. v. P.W. Scott Assocs., Inc.*, 748 A.2d 389, 391–92 (Del. 2000)).

[57] *Henry Schein*, 586 U.S. at 68.

[58] *W. IP Comms., Inc. v. Xactly Corp.*, 2014 WL 3032270, at *7 (Del. Super. June 25, 2014); *see Redeemer Comm. of Highland Crusader Fund v. Highland Cap. Mgmt., L.P.*, 2017 WL 713633, at *3 (Del. Ch. Feb. 23, 2017) (quoting *Legend Nat. Gas II Hldgs. v. Hargis*, 2012 WL 4481303, at *4 (Del. Ch. Sept. 28, 2012)); *see also AffiniPay, LLC v. West*, 2021 WL 4262225, at *5 (Del. Ch. Sept. 17, 2021) ("Delaware courts routinely apply *Willie Gary* in resolving a question of substantive arbitrability.").

[59] *Redeemer Comm.*, 2017 WL 713633, at *4 ("[S]ince the parties explicitly chose arbitration under the AAA rules, I presume that, consistent with those rules, arbitrability must be decided by the arbitrator. Under *Willie Gary*, I must examine whether the arbitration clause applies 'broadly,' absent which the presumption may be rebutted.").

[60] *McLaughlin v. McCann*, 942 A.2d 616, 625 (Del. Ch. 2008).

15

arbitration of all disputes.[61]   An arbitration clause that sends to arbitration "'any claim or controversy arising out of or relating to this agreement' . . . 'generally refers all disputes to arbitration.'"[62]

Both the First EAs and the Second EAs reference the AAA rules.[63]   That creates a heavy presumption that the parties intended to delegate substantive arbitrability disputes to the arbitrator.[64]   They also both state that the parties agreed to arbitrate generally all disputes.[65]   That reinforces the delegation presumption.

---

[61] *Willie Gary*, 906 A.2d at 80 (collecting cases).

[62] *Li v. Standard Fiber, LLC*, 2013 WL 1286202, at *6 (Del. Ch. Mar. 28, 2013).

[63] First EA § 10 ("The arbitration will be conducted in accordance with the National Rules for the Resolution of Employment Disputes of the [AAA]."); Second EA § 10 ("[B]oth [the employee] and the Company agree to submit such claim to binding arbitration under the auspices of the [AAA] in accordance with its then current Employment Arbitration Rules and mediation procedures.").

[64] *McLaughlin*, 942 A.2d at 625.

[65] First EA § 10 ("[The employee] and the Company agree to waive any rights to a trial before a judge or jury and agree to arbitrate before a neutral arbitrator any and all claims or disputes arising out of this letter agreement and any and all claims arising from or relating to [the employee's] employment with the Company, including (but not limited to) claims against any current or former employee, director or agent of the Company, claims of wrongful termination, retaliation, discrimination, harassment, breach of contract, breach of the covenant of good faith and fair dealing, defamation, invasion of privacy, fraud, misrepresentation, constructive discharge or failure to provide a leave of absence, or claims regarding commissions, stock options or bonuses, infliction of emotional distress or unfair business practices.");  Second EA § 10 ("In the event of any dispute or claim relating to or arising out of [the] employment relationship, both [employee] and the Company agree to submit such claim to binding arbitration under the auspices of . . . [AAA] in accordance with its then current Employment Arbitration Rules and mediation procedures . . . .  This arbitration provision includes all contractual, common-law and statutory claims, including all claims that the Company may have against [employee], as well as all claims that [employee] may have against the Company (including the Company's affiliates, officers, directors and employees).").

BME contends that carveouts in the EAs' arbitration provisions overcome the presumption that the parties intended to delegate substantive arbitrability, and so "something 'other than the incorporation of AAA rules' is needed to show 'that the parties intended to submit arbitrability questions to an arbitrator.'"[66] For carveouts and exceptions to overcome the delegation presumption, they must be "obviously broad and substantial."[67] In other words, if a provision generally refers all but a subset of disputes to arbitration, that subset must overwhelm the whole to negate that broad delegation.[68] "In cases where there is any rational basis for doubt about

---

[66] POB 44–46 (discussing *Willie Gary*, 906 A.2d 81).

[67] *UPM-Kymmene Corp. v. Renmatix, Inc.*, 2017 WL 4461130, at *4 (Del. Ch. Oct. 6, 2017) (quoting *McLaughlin*, 942 A.2d 616, 621).

[68] *State v. Corr. Officers Ass'n of Del.*, 2016 WL 6819733, at *6 (Del. Ch. Nov. 18, 2016) (determining a carveout is not obviously broad or substantial when the bulk of the disputes relating to the agreement do not concern the carveout); *Redeemer Comm.*, 2017 WL 713633, at *6–7 (first explaining a carveout is narrow when it "leaves to arbitration most substantive disputes," then acknowledging "the universe of potential conflicts arising under the agreement," and concluding the "carve-out was insufficiently broad to overcome the presumption created by the clear statement that *any dispute* is to be arbitrated pursuant to the AAA rules"); *Blackmon v. O3 Insight, Inc.*, 2021 WL 868559, at *3 (Del. Ch. Mar. 9, 2021) ("[T]he carve-out . . . [is not] so obviously broad and substantial as to overcome the parties' agreement to use arbitration under AAA rules to resolve the broad range of disputes that may 'aris[e] out of, relat[e] to, or . . . connect[ ] with' the [agreement]."); *BAYPO Ltd. P'ship v. Tech. JV, LP*, 940 A.2d 20, 27 (Del. Ch. 2007) (explaining carveouts must have the same "doctrinal significance as the broader language in *Willie Gary*").

that, the court should defer to arbitration, leaving to the arbitrator to decide what is or is not before her."[69]

The carveouts here are not so obviously broad and substantial as to overcome the delegation of generally all disputes, so they do not negate the presumption that the agreement to AAA rules delegated substantive arbitrability. The First EAs' carveouts read:

> The foregoing notwithstanding, this arbitration provision does not apply to (a) workers' compensation or unemployment insurance claims or (b) claims concerning the ownership, validity, infringement, misappropriation, disclosure, misuse or enforceability of any confidential information, patent right, copyright, mask work, trademark or any other trade secret or intellectual property held or sought by either [the employee] or the Company (whether or not arising under the Proprietary Information and Inventions Agreement between [the employee] and the Company).[70]

The Second EAs' carveouts read:

> Excluded from this mandatory arbitration provision are: (i) claims within the jurisdictional limitation of small claims courts of the state where the claim is submitted for resolution; (ii) claims for workers' compensation benefits; (iii) claims for unemployment insurance compensation benefits; and (iv) to the extent required by law, administrative claims or charges before applicable federal and state administrative agencies (such as California's Department of Fair Employment and Housing, the Equal Employment Opportunity

---

[69] *McLaughlin*, 942 A.2d at 625; *accord Hagler v. Evolve Acq. Lc*, 2021 WL 6123549, at *4 (Del. Ch. Dec. 28, 2021) (determining the parties delegated arbitrability where "virtually all non-fraud actions are subject broadly to arbitration," despite carveouts, because the broad submission of all disputes relating to the agreement coupled with the carveouts at least raised a "rational basis for doubt about" whether the parties intended an arbitrator to determine arbitrability).

[70] First EA § 10.

Commission or, and any unfair labor charge which is to be brought under the National Labor Relations Act).[71]

These narrow carveouts from an agreement to arbitrate all disputes do not overcome the delegation presumption. Other courts have held similarly for regulatory or statutory grievances,[72] claims for small amounts of money,[73] claims regarding confidential and proprietary information,[74] and intellectual property

---

[71] Second EA § 10.

[72] Carveouts ensuring an arbitration agreement recognizes a claimant's liberty to pursue matters according to a regulatory or statutory grievance procedure do not overcome the delegation presumption. *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26–28 (1991) (explaining a compulsory arbitration of ADEA claims pursuant to an arbitration agreement would not be inconsistent with the statutory framework and purposes of the ADEA because "[a]n individual ADEA claimant subject to an arbitration agreement will still be free to file a charge with the EEOC, even though the claimant is not able to institute a private judicial action"); *see also Corr. Officers Ass'n of Del.*, 2016 WL 6819733, at *6–7 (finding an arbitration carveout for grievance procedures contained in 29 Del. C. § 5943(a) merely ensures the agreement does not circumvent those grievance procedures and thus does not undermine *Willie Gary*); *see, e.g.*, 19 *Del. C.* §§ 2345–50 (detailing the grievance procedure for a workers' compensation complaint, providing a non-binding mediation alternative, and granting the Superior Court jurisdiction to hear and determine all appeals); *see also* 19 *Del. C.* §§ 3312, 3317 (indicating "[a]ll unemployment insurance benefits shall be paid through employment offices, in accordance with such regulations as the Department prescribes" and "all claims for benefits shall be made in accordance with such regulations as the Department prescribes").

[73] *W. IP Comms.*, 2014 WL 3032270, at *9 (collections actions); *McLaughlin*, 942 A.2d at 619, 626 (usury claims); *Redeemer Comm.*, 2017 WL 713633, at *5 (payment of indemnification obligations).

[74] *H&S Ventures, Inc. v. RM Techtronics, LLC*, 2017 WL 237623, at *2 n.39 (Del. Super. Jan. 18, 2017) (holding a carveout for all proprietary information was "one narrowly tailored exception that does not contravene this conclusion"); *H&S Ventures, Inc. v. RM Techtronics, LLC*, C.A. No. N15C-11-082 JRJ, D.I. 19, Ex. 1 § 11.1 (Del. Super. Feb. 29, 2016); *Legend Nat. Gas II Hldgs., LP v. Hargis*, 2012 WL 4481303, *5 (Del. Ch. Sept. 28, 2012) (declaring carveouts for protected information and a noncompete provision were narrowly tailored).

19

carveouts.[75]  These cases support the conclusion that the carveouts here, from an agreement to arbitrate all disputes, are not so obviously broad and substantial as to overcome the delegation of all disputes and the heavy delegation presumption from referencing the AAA rules.

### 2. The Parties Consented To Mass Claims Arbitration.

BME next objects to the aggregation of the Employees' claims in mass claims arbitration.  BME maintains it "has not consented to mass claims arbitration or application of the Mass Claims Rules, much less agreed to delegate the arbitrability of mass claims under the [AAA] Mass Claims Rules to an arbitrator."[76]  First, BME points out the EAs incorporated AAA employment arbitration rules, and AAA mass claims rules are a "supplement' to the Employment Rules" that only "took effect . . . in 2021, years after the Employment Agreements were allegedly

---

[75] *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1075–76 (9th Cir. 2013) (intellectual property rights); *Daiichi Sankyo Co., Ltd. v. Seattle Genetics, Inc.*, 2020 WL 6292825, at *3, *5 (D. Del. Mar. 25, 2020), *adopted by* 2020 WL 6286953 (D. Del. Oct. 27, 2020); *Daiichi Sankyo Co., Ltd. v. Seattle Genetics, Inc.*, 2020 WL 6286953, at *2 (D. Del. Oct. 27, 2020); *Richardson v. Coverall N. Am., Inc.*, 811 F. App'x 100, 103 n.2 (3d Cir. 2020); *BAE Sys. Aircraft Controls, Inc. v. Eclipse Aviation Corp.*, 224 F.R.D. 581, 585–86 (D. Del. 2004); *Promptu Sys. Corp. v. Comcast Corp.*, 2017 WL 4475966, at *5–6 (E.D. Pa. May 18, 2017); *cf. Medicis Pharm. Corp. v. Anacor Pharm., Inc.*, 2013 WL 4509652, at *3 (Del. Ch. Aug. 12, 2013) (noting a topical carveout for "disputes related to Patents and to Confidential Information"  in the shadow of an injunctive relief carveout broader than that in *Willie Gary* and concluding the arbitration provision did not generally provide for arbitration of all disputes).

[76] POB 46.

20

signed."[77]  BME argues it therefore cannot have consented to the mass claims supplementary rules. Second, BME insists that, even if the mass claims rules are applicable, the arbitration provision's mere reference to AAA rules cannot suffice as consent to collective arbitration in the form of mass claims arbitration. Both arguments fail.

### a. No Specific Consent To Supplementary Rules Is Required.

BME asserts OldCo never agreed to arbitrate under the mass claims arbitration rules because the rules did not exist when OldCo agreed to the EAs. But when OldCo and the EA Defendants agreed to arbitrate under AAA employment arbitration rules, they agreed to arbitrate under the rules that apply in form and effect at the time any arbitral demand is filed.

Courts, commentators, and AAA arbitral tribunals have consistently concluded that consent to the AAA's substantive rules also constitutes consent to any supplementary rules.[78] An agreement's incorporation of AAA rules incorporates

---

[77] *Id.* at 47.

[78] *Reed v. Fla. Metro. Univ., Inc.*, 681 F.3d 630, 635 n.5 (5th Cir. 2012) ("[C]onsent to any of the AAA's substantive rules also constitutes consent to the Supplementary Rules."), *abrogated on other grounds by Oxford Health Plans LLC v. Sutter*, 569 U.S. 564 (2013); *see Spirit Airlines, Inc. v. Maizes*, 899 F.3d 1230, 1233 (11th Cir. 2018) ("The parties' agreement plainly chose AAA rules. Those rules include AAA's Supplementary Rules for Class Arbitrations, which, true to their name, supplement the other AAA rules."); *JPay, Inc. v. Kobel*, 904 F.3d 923, 941–43 (11th Cir. 2018); Alan Scott Rau, *Arbitral Power and the Limits of Contract*, 22 Am. Rev. Int'l Arb. 435, 447 n.44 (2011) ("These

all future AAA amendments and supplements to those rules that would be in force and effect at the time the arbitration petition is submitted.[79] OldCo signed the First EAs in 2011, and the Second EAs in 2017, 2018, and 2020.[80] The first rule of the 2011 AAA Employment Arbitration Rules, like most AAA arbitration rules, states "[t]hese rules, and any amendment of them, shall apply in the form in effect at the time the demand for arbitration or submission is received by the AAA."[81] AAA implemented its supplementary rules for multiple employment/workplace case

---

supplementary . . . rules are to apply to any contract calling for arbitration under any body of AAA rules . . . ." (citing Comment. to the Am. Arb. Ass'ns Class Arbs. Pol'y (Feb. 18, 2005), *available at* https://www.adr.org/sites/default/files/document_repository/AAA-Policy-on-Class-Arbitrations.pdf); Thomas J. Oehmke, *Cause of Action for Class Arbitration of Contract-Based Disputes*, 28 Causes of Action 2d 203 § 38 (2024) ("[The AAA] Supplementary Rules[] apply to any dispute arising out of an agreement providing for arbitration under any of the AAA rules . . . , [and they] supplement any other applicable AAA rules.").

[79] AAA Empl. Rules R–1 (2011) [hereinafter "AAA Empl. Rules"], *available at* https://www.adr.org/sites/default/files/Employment%20Arbitration%20Rules%20and%20Mediation%20Procedures%20-%20Nov%202009%20May%202013.pdf; *Fla. Metro. Univ.*, 681 F.3d at 635 n.5; *Spirit Airlines*, 899 F.3d at 1233; *see also JSC Surgutneftegaz v. President & Fellows of Harvard Coll.*, 167 F. App'x 266, 268 (2d Cir. 2006) ("Surgut's argument that the 1996 version of the AAA's Commercial Rules does not contain [a clause empowering the arbitrator to determine arbitrability] is inapposite because Rule 1 of that version provides that the 'rules and any amendment of them shall apply in the form obtaining at the time the demand for arbitration or submission agreement is received by the AAA.'").

[80] D.I. 36, Ex. 1; *see, e.g.*, D.I. 36, Ex. 2 Part 1 at Ex. 2.2 § 10.

[81] AAA Empl. Rules R–1 (2011); *see JSC Surgutneftegaz*, 167 F. App'x at 268.

filings in 2021.[82]  OldCo agreed to arbitrate under AAA supplementary rules for mass claims arbitration.

### b. The EAs Delegated The Question Of Mass Arbitrability.

Finally, BME objects to arbitration on the grounds that it cannot be compelled to arbitrate the propriety of mass claims arbitration without specific evidence OldCo agreed to delegate that issue.[83]  BME contends that a provision delegating substantive arbitrability under *Willie Gary* is not enough to evince OldCo's specific intent to delegate mass claims arbitrability.  BME equates mass claims arbitration to class action arbitration, then relies on federal law holding that a provision generally delegating substantive arbitrability must specifically delegate class action arbitrability.[84]

But that federal law is half of a circuit split.  This opinion does not take a side, as the reasons for requiring specific evidence of an intent to delegate class action arbitrability do not apply to mass claims arbitration.

---

[82] POB 46; D.I. 1, Ex. 12 at MC–1(a).

[83] POB 46–47; PAB 28.

[84] POB 47 (citing *Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 809 F.3d 746, 762 (3d Cir. 2016)); PAB 28 (same); *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 685 (2010) ("An implicit agreement to authorize class-action arbitration . . . is not a term that the arbitrator may infer solely from the fact of the parties' agreement to arbitrate.  This is so because class-action arbitration changes the nature of arbitration to such a degree that it cannot be presumed the parties consented to it by simply agreeing to submit their disputes to an arbitrator.").

### i. Whether The Delegation Of Class Action Arbitrability Requires More Than Incorporating AAA Rules

BME is correct that the United States Court of Appeals for the Third Circuit requires more evidence of intent than the invocation of AAA rules before it will delegate class arbitrability to the arbitrator.[85] The Third Circuit reached that conclusion even though the AAA rules empower the arbitrator to determine if the parties agreed to class action arbitration.[86] The Fourth, Sixth, and Eighth Circuits are in accord.[87]

But it is far from settled that an arbitration agreement that evinces the intent to delegate substantive arbitrability must clearly and unmistakably evince the specific intent to delegate class action arbitrability. There is a "circuit split on whether incorporation of the AAA Rules is sufficient evidence that the parties

---

[85] *Chesapeake Appalachia*, 809 F.3d at 759–62.

[86] *Id.* at 749–51.

[87] *See JPay*, 904 F.3d at 935 (acknowledging the Fourth and Eighth Circuits reached the same conclusion as the Third Circuit (first citing *Catamaran Corp. v. Towncrest Pharmacy*, 864 F.3d 966, 971–72 (8th Cir. 2017); then citing *Del Webb Cmtys., Inc. v. Carlson*, 817 F.3d 867, 874–77 (4th Cir. 2016))); *see also Shivkov v. Artex Risk Sols., Inc.*, 974 F.3d 1051, 1068 (9th Cir. 2020) (acknowledging the Third, Sixth, and Eighth Circuits held that incorporation of the AAA Rules is insufficient for determining whether the agreement permits an arbitrator to determine class arbitrability); *Reed Elsevier, Inc. ex rel. LexisNexis Div. v. Crockett*, 734 F.3d 594, 599 (6th Cir. 2013) (holding an arbitration provision invoking AAA rules and sending any controversy, claim, or counterclaim "arising out of or in connection with [the customer's] order" does not sufficiently indicate the parties agreed to send class arbitrability to the arbitrator).

clearly and unmistakably delegated the issue of class arbitration to the arbitrator."[88]

Other circuits reason there is no basis to distinguish class arbitrability from other substantive arbitrability questions asking what claims must be arbitrated, and these courts apply the same standard for identifying an intent to delegate class arbitrability to the arbitrator.[89] Under that standard, delegations of substantive arbitrability include the question of class arbitrability.[90] The Supreme Court of the United States has expressly not ruled on the matter.[91] From what I can find, Delaware has not yet

---

[88] *Shivkov*, 974 F.3d at 1068; *see JPay*, 904 F.3d at 942–44 (collecting cases) (discussing *Chesapeake Appalachia*'s treatment of class action arbitrability and holding it was inconsistent with the Eleventh Circuit's treatment of substantive arbitrability, "which gave no indication that questions of arbitrability are treated as anything but a unitary category"); *Dish Network LLC v. Ray*, 900 F.3d 1240, 1247 (10th Cir. 2018) (discussing the Third and Sixth Circuits' treatment of class action arbitrability and disagreeing with their reasoning); *Wells Fargo Advisors, LLC v. Sappington*, 884 F.3d 392, 398–99 (2d Cir. 2018) (disagreeing with the Eighth, Third, and Sixth Circuits and explaining there is only one unitary substantive arbitrability determination, and it provides for the concerns relating to class arbitration).

[89] *JPay*, 904 F.3d at 942–44; *Dish Network*, 900 F.3d at 1247; *Wells Fargo*, 884 F.3d at 398.

[90] *See JPay*, 904 F.3d at 943 ("[A] consistent body of case law has spoken of questions of arbitrability as a unitary category. There is no reason to consider whether any particular question of arbitrability is specifically delegated because the questions are typically delegated or preserved as a group."); *Dish Network*, 900 F.3d at 1247–48 ("'[C]lass arbitration question is a question of arbitrability and, accordingly,' . . . incorporation of the AAA Rules provides clear and unmistakable evidence that the parties intended to delegate matters of arbitrability to the arbitrator." (quoting *Wells Fargo v. Sappington*, 884 F.3d 392, 398–99 (2d Cir. 2018))).

[91] *Oxford Health*, 569 U.S. at 569 n.2 (explaining that the case gave the Court "no opportunity to [determine whether class arbitration is a so-called 'question of arbitrability'] because [the parties] agreed that the arbitrator should determine whether its contract with Sutter authorized class procedures"); *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 186 n.4 (2019) ("This Court has not decided whether the availability of class arbitration is a so-

had occasion to take a position. BME has not acknowledged the split in authority or made any argument as to why one conclusion is right and the other is wrong.

### ii. Mass Claims Arbitration Does Not Present The Same Concerns As Class Action Arbitration.

Even if specific intent to delegate class arbitrability were necessary, BME would still have to support extending that requirement to mass claims arbitrability. Mass claims arbitration is meaningfully different than class action arbitration and presents none of the traits of class action arbitration that have given courts pause in delegating class arbitrability. BME fails to convince me that mass claims arbitration requires other clear and unambiguous evidence to delegate arbitrability than what *Willie Gary* requires.

Federal courts, including the United States Supreme Court, have explained that the representative nature of class action arbitration warrants vigilance against permitting it to proceed where it has not been agreed upon. Class action arbitration "changes the nature of arbitration" by (i) "no longer resolv[ing] a single dispute between the parties to a single agreement," (ii) permitting the arbitrator to "adjudicate[] the rights of absent parties," (iii) naming claimants as a class rather than as individuals, (iv) permitting one representative to file on behalf of others, and

---

called 'question of arbitrability,' [and] . . . [w]e have no occasion to address that question here because the parties agreed that a court, not an arbitrator, should resolve the question about class arbitration."); *see JPay*, 904 F.3d at 926 (noting that whether class arbitrability is presumptively for a court "has been expressly left open by the Supreme Court").

(v) designating a single arbitrator to decide the matters that affect the entire class.[92]

Further, "while it is theoretically possible to select an arbitrator with some expertise relevant to the class-certification question, arbitrators are not generally knowledgeable in the often-dominant procedural aspects of certification, such as the protection of absent parties."[93] And so, an arbitrator cannot presume "mere silence on the issue of class-action arbitration constitutes consent to resolve their disputes in class proceedings."[94]

Mass claims arbitration is not representative and so does not present these concerns. In mass claims arbitration, multiple claimants "separately file demands for arbitration. Each claimant is named individually and is assigned to a separate Merits Arbitrator."[95] "Cases that proceed to the [m]erits [a]rbitrators are decided individually. There is a separate decision, or award, for each case from the [m]erits [a]rbitrator," and each decision is based solely on the laws and facts of the individual

---

[92] *Stolt-Nielsen*, 559 U.S. at 686–87; *accord AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 348 (2011); *see Chesapeake Appalachia*, 809 F.3d at 765 (discussing *Stolt-Nielsen* and *Concepcion*); *see also* Neil B. Currie, *How Has Mass Arbitration Evolved and Where Is It Going?*, 20 Today's Gen. Couns. 14 (Oct. 2023) [hereinafter "Currie"].

[93] *AT&T Mobility*, 563 U.S. at 348.

[94] *Stolt-Nielsen*, 559 U.S. at 687.

[95] Currie at 14; *accord* D.I. 1, Ex. 12 at MC–2 [hereinafter "AAA Supp. Rules"] ("A separate Demand for Arbitration must be filed in each individual case."); *id.* at MC–7. To help ensure consistency, parties are given the option to have one arbitrator assigned to the multiple cases; but "the individual arbitrator will still decide each case individually." Currie at 14.

claim.[96] AAA utilizes mass claims arbitration for procedural and administrative reasons only. AAA created rules for multiple case filings in 2021 "to address party disputes about the administrative process . . . , such as which rules would apply if there's a dispute between the parties."[97] These disputes are "addressed . . . by the Process Arbitrator, [whose] decision . . . [applies] to all the cases."[98] "Only administrative issues may be submitted to the [p]rocess [a]rbitrator for determination."[99] Issues delegated to the process arbitrator include:

> (i) AAA filing requirements; (ii) allocation of payment advances on administrative fees . . . ; (iii) determining the applicable AAA rules that will govern individual disputes; (iv) any other issues the parties wish to submit by agreement; and (v) any other administrative issue arising out of the nature of the [m]ultiple [c]ase [f]ilings.[100]

This limited aggregation presents no risk of delay from encumbering preliminary determinations on whether the "class itself may be certified, whether the named parties are sufficiently representative and typical, and how discovery for the

---

[96] *Id.*

[97] *Id.*; *accord* D.I. 1, Ex. 12 at MC–6(c)–(d) ("There [is] . . . one [p]rocess [a]rbitrator . . . .").

[98] Currie at 14. To help ensure consistency, parties are given the option to have one arbitrator assigned to the multiple cases; but "the individual arbitrator will still decide each case individually." *Id.*

[99] *Id.*; *see* D.I. 1, Ex. 12 at MC–6(c)–(d); *MacClelland v. Cellco P'ship*, 609 F. Supp. 3d 1024, 1043 (N.D. Cal. 2022) (calling AAA supplementary rules for multiple case filings a "bellwether system to adjudicate a group of cases with the purpose of facilitating global or widespread resolution").

[100] AAA Supp. Rules at MC–6(d).

class should be conducted."[101]   It does not present the concern of absent class members, or of one party representing another.  Nor does it present the concerns of one arbitrator deciding substantive issues for multiple claimants, or of saddling an arbitrator with complex representative procedural questions.

The AAA's treatment of mass claims arbitration and class action arbitration recognizes class action arbitration's unique concerns.  The 2021 mass claims arbitration rules are separate and different from the supplementary rules for class action arbitration that the AAA implemented in 2005.[102]  The AAA class action

---

[101] *AT&T Mobility*, 563 U.S. at 348.

[102] AAA implemented supplementary rules for class arbitration in 2005 after *Green Tree Financial Corporation v. Bazzle* declared the "class arbitration issue did not constitute a 'gateway'" or arbitrability matter that is generally decided by a court but was instead a procedural matter for the arbitrator.  539 U.S. 444, 452 (2003); *see* Am. Arb. Ass'n Pol'y on Class Arbs. (July 14, 2005), *available at* https://www.adr.org/sites/default/files/document_repository/AAA%20Policy%20on%20Class%20Arbitrations.pdf (identifying AAA's response to *Bazzle*); William H. Baker, *Class Action Arbitration*, 10 Cardozo J. Conflict Resol. 335, 339–43 (2009) (noting arbitration institutions responded to *Bazzle* by creating supplementary class arbitration rules and specifically outlining the procedures instituted by the AAA and the Judicial Arbitration and Mediation Services).

By contrast, AAA implemented supplementary rules for multiple case filings in response to a growing trend where "employees and consumers band together to bring mass-arbitration claims and use the arbitration's fee structures against defendant-companies by pressuring them to pay enormous upfront required arbitration fees." Alexi Pfeffer-Gillett, *Unfair by Default: Arbitration's Reverse Default Judgment Problem*, 171 U. Pa. L. Rev. 459, 495 (2023).  Despite early successes for plaintiffs, defendant-companies began pressuring arbitration providers to implement more defendant-friendly protections in the multiple case filing setting.  *Id.* at 500. "Amazon, faced with the threat of a 75,000-member mass [claims] arbitration in 2021, quietly removed arbitration from the company's terms of service." *Id.* at 499.  And so, "both the AAA and JAMS, perhaps fearing an exodus . . . by major repeat-player businesses . . . , quickly adopted new rules and modified existing ones to make their

---

29

arbitration rules permit class certification only after "the arbitrator is satisfied that the arbitration clause permits the arbitration to proceed as a class arbitration."[103] Under AAA mass claims arbitration rules, the arbitrator "has the authority" to convert separately filed individual arbitration claims into mass claims arbitration and will do so "whenever 25 or more similar Demands for Arbitration are filed, whether or not such cases are filed simultaneously."[104]  Thus, even if all ninety-one EA Defendants had submitted separate petitions at separate times, the AAA arbitrator could have independently converted the ninety-one actions into a mass claims arbitration.

As explained, the EA parties agreed to arbitrate under AAA rules and to arbitrate generally all disputes, and the EA parties agreed to delegate arbitrability questions to the arbitrator.  Mass claims arbitration does not present the unique representative concerns that class action arbitration presents, making BME's attempt

---

services more accommodating of defendants." *Id.* at 500.  Effective August 2021, the AAA instituted "Supplementary Rules for Multiple Case Filings" to provide for appointment of a "Process Arbitrator" at the outset of mass filings, among other things. Michael E. McCarthy, *Reversing "Poetic Justice"*, 45 L.A. Law. 22, *26 n.43 (2023) (citing Am. Arb. Ass'n Supp. Rules for Multiple Case Filings at MC-6).

[103] AAA Supp. Rules for Class Arb. at R–4(a), *available at* https://www.adr.org/sites/default/files/document_repository/Supplementary%20Rules%20for%20Class%20Arbitrat ions.pdf; *Stolt-Nielsen*, 559 U.S. at 684 ("[A] party may not be compelled . . . to submit to class arbitration unless there is a contractual basis for concluding that the party agreed to do so.").

[104] AAA Supp. Rules at MC-1(a)–(g).

to impose the specific intent of class arbitrability onto mass arbitrability unsupported. I see no need to deviate from the AAA rules and require evidence of a specific intent to participate in mass claims arbitration. An agreement to delegate substantive arbitrability includes a delegation of mass arbitrability to the extent that question is one of substantive arbitrability.[105]

---

[105] This opinion does not categorize the propriety of mass claims arbitration as a question of substantive or procedural arbitrability. Federal courts on both sides of the circuit split categorize the propriety of class action arbitrability as a "question of arbitrability" because it determines what claims can be brought. *Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 809 F.3d 746, 762 (3d Cir. 2016); *JPay*, 904 F.3d at 942–43. Whether claims are handled in a mass claims arbitration or on an individualized basis does not affect whether the claims will be heard in arbitration. It may be that the propriety of mass claims arbitration is a question of procedural arbitrability, in which case no *Willie Gary* analysis would be performed, as all questions of procedural arbitrability are for the arbitrator. *Gandhi-Kapoor*, 307 A.3d at 348 (citing *Fairstead*, 288 A.3d at 751). The parties did not engage on this point. This opinion merely rejects BME's argument that additional evidence of specific intent to delegate the question of mass arbitrability, over and above what *Willie Gary* requires, is necessary for this Court to relinquish that question.

I note that other courts have held that the propriety of mass claims arbitration can be decided by the arbitrator. *See Wallrich v. Samsung Elec. Am., Inc.*, 2023 WL 5935024, at *9 (N.D. Ill. Sept. 12, 2023) (in view of a collection action waiver, concluding that the propriety of mass claims arbitration was a question of scope, and so "because the parties both agreed to delegate enforceability questions to the arbitrator and incorporated the AAA rules in the arbitration agreement, the question of whether Petitioners' mass filings violate the Arbitration Agreement remains for an arbitrator, not this Court" (citing *Henry Schein*, 586 U.S. at 68–69)); *McClenon v. Postmates Inc.*, 473 F. Supp. 3d 803, 812 (N.D. Ill. 2020) (interpreting a delegation clause to provide that whether mass claims arbitration violates a class action waiver is for the arbitrator to determine); *Adams v. Postmates, Inc.*, 414 F. Supp. 3d 1246, 1251–52, 1254–55 (N.D. Cal. 2019) (concluding that particularly where arbitrability has been delegated to the arbitrator, the propriety of mass claims arbitration "is within the arbitrator's exclusive authority," and citing AAA Commercial Arbitration Rules, R-32 as "conferring the arbitrator with discretion in conducting the proceedings").

### B. Whether Other Agreements Disrupt The Delegation Of Arbitrability

Facing the conclusion that the EAs delegate substantive arbitrability (including mass claims arbitrability) to the arbitrator, BME casts its net wider in search of an argument that only this Court can hear. BME looks to the interplay between the OAs and the EAs to fashion an argument going to the existence of an agreement to arbitrate, which the Court would hear. But despite BME's best efforts to package its argument as one for the Court, its argument that the Employees' claims "do not fall under the [EAs'] arbitration clauses"[106] is actually a substantive arbitrability question for the arbitrator.

#### 1. BME Has Not Asked The Court To Decide Whether An Arbitration Agreement Exists.

The first issue before a court in an action to compel arbitration is whether an agreement to arbitrate exists.[107] "The liberal policy 'favoring arbitration agreements . . . is at bottom a policy guaranteeing the enforcement of private contractual arrangements."[108] "[A]rbitration 'is a consensual proceeding, and the

---

[106] PAB 13; *see* POB 32, 41–43.

[107] *Pettinaro Const. Co., Inc. v. Harry Partridge, Jr. & Sons, Inc.*, 408 A.2d 957, 962 (Del. Ch. 1979).

[108] *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 194 (3d Cir. 2001) (first quoting *Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99, 104–05 (3d Cir. 2000); then quoting *Bel–Ray Co., Inc. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 444 (3d Cir. 1999)).

court may not require arbitration unless the parties have a contract to arbitrate.'"[109]

Courts apply ordinary state law principles governing contract formation to determine whether a valid arbitration agreement exists.[110] "A consistent line of decisions from the United States Court of Appeals for the Third Circuit holds that a court must address issues of contract formation before deferring to an arbitrator to resolve the who-decides question under a delegation provision."[111] "The Supreme Court of the United States has directed courts to treat the agreement to arbitrate found within a larger contract as a severable, mini-agreement whose enforceability rises and falls separately from the larger agreement, which is known as the container contract."[112]

---

[109] *Milton Invs., LLC v. Lockwood Bros., II, LLC*, 2010 WL 2836404, at *5 (Del. Ch. July 20, 2010) (quoting *Brown v. T-Ink, LLC*, 2007 WL 4302594, at *10 (Del. Ch. Dec. 4, 2007)).

[110] *Pettinaro Const. Co.*, 408 A.2d at 962.

[111] *Fairstead*, 288 A.3d at 752–53 (explaining that questions of the formation of a contract involve challenges over the existence of the contract, and "a court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate that dispute"); *Henry Schein*, 586 U.S. at 69 ("[B]efore referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists."); *Gandhi-Kapoor*, 307 A.3d at 356 ("A court must . . . always address challenges to the existence of the arbitration agreement."); *Kuhn Const., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396 (Del. 2010) ("We will not enforce a contract that unclearly or ambiguously reflects the intention to arbitrate."); *DMS Properties-First, Inc. v. P.W. Scott Assocs., Inc.*, 748 A.2d 389, 393 (Del. 2000) ("[T]he existence of an agreement to arbitrate is a threshold issue, [and] the courts must have authority to assess . . . whether or not the parties ever reached such an agreement."); *Gandhi-Kapoor*, 307 A.3d at 356 ("Determining whether a judicial conduct waiver has occurred is in effect, a determination of whether the agreement to arbitrate still exists; and . . . that is a proper issue for the court." (internal quotation marks omitted)).

[112] *Fairstead*, 288 A.3d at 735 n.1 (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 (1967)).

33

The court answers whether an agreement to arbitrate exists when a prior agreement to arbitrate might be superseded by a later agreement.[113] If supersession is incomplete, and the court finds an agreement to arbitrate "still exists," then the court must still "enforce [the] arbitration provision as to what that contract covers."[114] Supersession cases presenting the court with the question of whether the arbitration agreement still exists include the Third Circuit's *Field Intelligence v. Xylem Dewatering Solutions*,[115] the Eleventh Circuit's *Dasher v. RBC Bank (USA)*,[116] and this Court's *3850 & 3860 Colonial Boulevard v. Griffin*.[117] Those cases explained that an argument that a container agreement was entirely superseded "put[s] the existence of th[e] very [arbitration agreement] in dispute"; they noted that the existence of an arbitration agreement is a question for the court; and they proceeded to consider the continuing existence of the container agreement to determine the parties' continuing assent to arbitrate.[118] Once *Field Intelligence* and

---

[113] *Field Intel. Inc. v. Xylem Dewatering Sols. Inc.*, 49 F.4th 351, 356–58 (3d Cir. 2022).

[114] *Id.* at 360.

[115] POB 41–43 (discussing *Field Intel.*, 49 F.4th 351).

[116] *Id.* at 42–43 (discussing *Dasher v. RBC Bank (USA)*, 745 F.3d 1111 (11th Cir. 2014)).

[117] 2015 WL 894928, at *4 (Del. Ch. Feb. 26, 2015); *id.* at *4 n.41 ("It is . . . well settled that where the dispute at issue concerns contract formation, the dispute is generally for courts to decide." (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010))).

[118] *Field Intel.*, 49 F.4th at 356–58 ("[T]he existence of the parties' arbitration agreement has been challenged . . . [and] a court, rather than an arbitrator, must decide whether the parties' 2017 contract superseded their 2013 agreement . . . ."); *Dasher v. RBC Bank (USA)*,

34

*Colonial Boulevard* concluded the container agreement existed, they explicitly left substantive arbitrability for the arbitrator.[119]

In an attempt to secure judicial review, BME argues the fully integrated OAs superseded the EAs, including their arbitration provisions, to the extent they address stock options.[120] But BME's argument is not whether the EAs' arbitration provisions exist; BME does not contend the OAs wiped out the EAs or their arbitration provisions. Instead, it claims "the integration clause in the [OAs] bars [the EA

745 F.3d 1111, 1116–17 (11th Cir. 2014) (explaining the determination of "whether an arbitration agreement exists," generally requires application of "state-law principles that govern the formation of contracts" and holding that because "the parties expressed their clear and definite intent to execute a new contract to supersede the [prior] contract," and because "[t]he new contract did not incorporate by reference the prior . . . arbitration agreement . . . [defendants] cannot prove the existence of an agreement to arbitrate all disputes arising out of the [new] contract" (first quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); then quoting *Burgess v. Jim Walter Homes, Inc.*, 588 S.E.2d 575, 578 (N.C. Ct. App. 2003))); *id.* at 1119 ("[T]his case . . . involves superseding the entire agreement containing an arbitration provision . . . .").

[119] *Field Intel.*, 49 F.4th at 360; *Colonial Blvd.*, 2015 WL 894928, at *5–8.

[120] PAB 21. BME cites *Kantz v. AT&T, Inc.* once in a string citation for support of its supersession argument. PAB 20 (citing *Kantz v. AT&T, Inc.*, 2022 WL 413946, at *3 (3d Cir. Feb. 10, 2022)). But *Kantz* discloses that it is not binding precedent under Internal Operating Procedures of the United States Court of Appeals for the Third Circuit ("I.O.P.")] 5.7. *See* 2022 WL 413946, at n.* (3d Cir. Feb. 10, 2022); I.O.P. 5.7 ("The court by tradition does not cite to its not precedential opinions as authority. Such opinions are not regarded as precedents that bind the court because they do not circulate to the full court before filing."). I do not engage or extend *Kantz* here. *Focus Fin. P'rs, LLC v. Holsopple*, 250 A.3d 939, 964 n.13 (Del. Ch. 2020) (declining to follow *Coface Collections N. Am. Inc. v. Newton*, 430 F. App'x 162 (3d Cir. June 6, 2011) and explaining "[t]he *Coface* opinion . . . is marked 'NOT PRECEDENTIAL' under I.O.P. 5.7 and "[n]on-precedential opinions appear[ ] only to have value to the trial court and the parties" (fourth alteration in original) (internal quotation marks omitted)).

Defendants] from bringing claims regarding stock options under the [EAs]."[121]

BME does not dispute the EAs exist, that they are valid or enforceable agreements, or that BME is bound by them; it simply argues "claims regarding stock options" are essentially carved out from the EAs because the OAs subsequently asserted sole governance over the subject of "stock options."[122] That is a question of substantive arbitrability that remains delegated to the arbitrator.

The court also answers whether an agreement to arbitrate exists when an existing or potential arbitration claim implicates an agreement lacking an arbitration provision. A court, not an arbitrator, decides if the parties intended to delegate substantive arbitrability when an arbitration claim purports to rely on an agreement to arbitrate but expressly invokes an arbitration-free agreement.[123] The court "satisf[ies] itself that such [an] agreement exists" for those claims by "resolv[ing] any issue that calls into question the formation or applicability of the specific

---

[121] PAB 21.

[122] *See*, *e.g.*, *id.*

[123] *TowerHill Wealth Mgmt., LLC v. Bander Fam. P'ship, L.P.*, 2008 WL 4615865, at *1, *3 (Del. Ch. Oct. 9, 2008) (concluding the Court would decide substantive arbitrability of a claim brought under a mandatory arbitration provision that alleges breach of another agreement that "calls for resolution in this Court, after the parties first submit to non-binding arbitration or mediation"); *Hough Assocs., Inc. v. Hill*, 2007 WL 148751, at *11 (Del. Ch. Jan. 17, 2007) (determining substantive arbitrability in rejecting invocation of a mandatory arbitration provision for a claim based on a different agreement); *Fairstead*, 288 A.3d at 758 (explaining that if a claim expressly invokes an arbitration-free agreement, "[t]he court . . . must determine whether the claims in . . . [such a] case are subject to arbitration"); *e.g.*, *Kokorich v. Momentus Inc.*, 2023 WL 3454190, at *4, *5 (Del. Ch. May 15, 2023).

36

arbitration clause."[124] *Fairstead Capital Management v. Blodgett* involved an arbitration petition that expressly relied on multiple agreements, including two later ones lacking arbitration provisions.[125] The *Fairstead* plaintiffs "sought a permanent injunction barring [the defendant] from arbitrating claims arising under the [later] [a]greements" because an arbitration agreement did not exist for those claims.[126] Describing the issue as a "contract formation issue" that should be decided by a court,[127] *Fairstead* concluded that for claims under the second agreement, the integration clause "wipe[d] out" the earlier arbitration provision, leaving the later agreement's forum selection provision to control "the subject matter of the [later]

---

[124] *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010).

[125] *Fairstead*, 288 A.3d at 758.

[126] *Id.* at 746; *see Fairstead Cap. Mgmt. LLC v. Blodgett*, C.A. No. 2022-0673-JTL, D.I. 23 at 18 (Del. Ch. Aug. 26, 2022) ("[T]he parties to the Employment Agreement are Fortitude and Defendant and its terms govern disputes among those parties; the LLC Agreements, by contrast, govern all disputes among their parties—each of Plaintiffs, respectively."); *see also TowerHill*, 2008 WL 4615865, at *3–4 (discussing the defendant's reliance on one agreement's binding arbitration provision as the jurisdictional hook for arbitration, and the arbitration petition that rested on provisions of another agreement without a binding arbitration provision, and holding arbitrability was for the court).

[127] *See Fairstead*, 288 A.3d at 736 ("The LLCs argue that the parties subsequently agreed to litigate disputes under the LLC agreements in this court. That . . . is an issue for this court because it presents another question about the existence of the arbitration agreement that only a court can resolve."); *id.* at 753 ("A consistent line of decisions from the United States Court of Appeals for the Third Circuit holds that a court must address issues of contract formation before deferring to an arbitrator to resolve the who-decides question under a delegation provision." (collecting cases, first citing *Field Intel.*, 49 F.4th at 356)); *see also Field Intel.*, 49 F.4th at 357 (explaining courts "must 'decide questions about the formation or existence of an arbitration agreement, namely, the element of mutual assent.'" (quoting *MZM Constr. Co. v. N.J. Bldg. Laborers Statewide Benefit Funds*, 974 F.3d 386, 397–98 (3d Cir. 2020))).

agreements."[128]  And so, "[a]ny claims for breach of the [earlier agreement] must be arbitrated," and any claims for breach of the later agreements must be litigated.[129]

BME's argument is a mismatch for *Fairstead* as well.  The EA Defendants are not bringing a claim for breach of the OAs, and BME is not asking the Court to enjoin the arbitration of any such claim.[130]  BME acknowledges the arbitration petition never mentions the OAs, let alone relies on them.[131]  BME is asking the Court to enjoin claims expressly naming the EAs only.  As to the EAs, an arbitration agreement exists.[132]  BME's argument relying on the OAs does not go to the existence of the EAs' arbitration agreement.  BME cannot secure this Court's review on those grounds.

---

[128] *Fairstead*, 288 A.3d at 746, 760.

[129] *Id.* at 761.

[130] BME argues this is the claim the EA Defendants should have brought.  D.I. 55 at 22 (BME counsel explaining the defendants should be asserting claims against [Parent] under the Charter); *id.* at 19 (BME counsel stating the arbitration claims though pled as under the EAs "are truly arising under the charter of the publicly owned parent").  I reject this argument and discuss it in greater detail under Section II.B.3.b. of this opinion.

[131] *See* POB 17 ("Defendants' [a]mended . . . [c]laims do not address Defendants' stock option agreements with OldCo . . . ."); *id.* at 32 (arguing the arbitration claims do not relate to "stock options": "[e]ven if the [a]mended . . . [c]laims were related to Defendants' stock options (and they are not)").

[132] *See Fairstead*, 288 A.3d at 760–61 ("[A]ny claims for breach of the [e]mployment [a]greement must be arbitrated.); *Field Intel.*, 49 F.4th at 359 ("The result:  claims involving the first agreement are heard by an arbitrator, while claims involving the second are heard in court.").

## 2. The Multiple Agreements Present No Justiciable Conflict About Who Decides Substantive Arbitrability.

BME next attempts to question the formation and applicability of the EAs' arbitration provisions by arguing the OAs clash with the EAs in a way that requires the Court to determine substantive arbitrability. As a prefatory matter, I must consider the EA Defendants' argument that BME is estopped from making this argument in view of *BuzzFeed I*. After concluding BME is not estopped, I take on BME's argument. Here, too, BME is actually arguing substantive arbitrability and not a higher-level question that this Court can decide.

### a. BME Is Not Estopped From Considering The OAs' Effect On The EAs' Delegation Of Substantive Arbitrability.

*BuzzFeed I* determined the EAs reflect the EA parties' clear intentions to send substantive arbitrability to the arbitrator, notwithstanding the OAs.[133] In this second round, BME makes more arguments about the OAs' effect on the EAs' delegation. The EA Defendants argue BME should be precluded from doing so under the doctrine of collateral estoppel. BME insists collateral estoppel does not apply because *BuzzFeed I*'s determination on that issue was "'not essential' to the Court's

---

[133] *BuzzFeed I*, 2022 WL 15627216, at *6–7.

39

decision," or because there has been "an intervening change in the applicable legal context."[134]

The doctrine of collateral estoppel "bars successive litigation of 'an issue of fact or law' that is 'actually litigated and determined by a valid and final judgment, and . . . is essential to the judgment.'"[135]  "A determination ranks as necessary or essential only when the final outcome hinges on it."[136] The requirement that an issue be essential to the resulting judgment "is applied narrowly and only precludes those [issues] vital or crucial to the previous judgment . . . without which the previous judgment would lack support."[137]  In other words, "if a judgment does not depend on a given determination," the determination is considered "merely dicta," and "relitigation of [it] is not precluded."[138]

The *BuzzFeed I* judgment did not depend on its assessment that the EAs reflected a clear intention to delegate substantive arbitrability notwithstanding the

---

[134] PAB 23–24 (first citing *Messick v. Star Enter.*, 655 A.2d 1209, 1211 (Del. 1995); then citing *Stevanov v. O'Connor*, 2009 WL 1059640, at *10 n.51 (Del. Ch. Apr. 21, 2009)).

[135] *Bobby v. Bies*, 556 U.S. 825, 834 (2009) (quoting Restatement (Second) of Judgments § 27 (Am. L. Inst. 1980)); *Messick*, 655 A.2d at 1211 (applying collateral estoppel only where "(1) a question of fact essential to the judgment, (2) [was] litigated and (3) determined (4) by a valid and final judgment").

[136] *Bobby*, 556 U.S. at 835.

[137] 50 C.J.S *Judgments* § 1017 (2023).

[138] *Bobby*, 556 U.S. at 834 (citing Restatement (Second) of Judgments § 27, Comment h (Am. L. Inst. 1980)); *Nat'l R.R. Passenger Corp. v. Pa. Pub. Util. Comm'n*, 288 F.3d 519, 527 (3d Cir. 2002) ("Thus, in determining whether the issue was essential to the judgment, we must look to whether the issue was critical to the judgment or merely dicta.").

OAs. In *BuzzFeed I*, the Employees asked this Court to declare the EAs required an arbitrator to determine arbitrability and to dismiss the plaintiffs' claims under Rule 12(b)(1).[139] I began with the Employees' jurisdictional Rule 12(b)(1) motion and delegation of substantive arbitrability. I determined the EAs reflected their parties' intent to delegate substantive arbitrability to the arbitrator—but I denied the motion because "none of the [p]laintiffs [we]re bound by the Employment Agreements."[140]

This no-intention-to-arbitrate judgment stands alone from, and is more fundamental than, the assessment of the EA parties' delegation intentions.[141] The "question[] about the formation or existence of an arbitration agreement, namely, the element of mutual assent," precedes and animates the "who decides" decision tree[142] because "[a] dispute over the scope of an arbitration provision," or "substantive arbitrability," presupposes the existence of an agreement to arbitrate.[143]

---

[139] *BuzzFeed I*, 2022 WL 15627216, at *5–6.

[140] *Id.* at *6, *14.

[141] *Id.* at *7 ("When conflicting arbitration provisions muddy *the parties'* intentions regarding substantive arbitrability, it cannot be said that *the parties intended* to submit the question of substantive arbitrability to the arbitrator."); *id.* at *14 ("[I]ntent in those [Employment] Agreements cannot be imputed to Plaintiffs.").

[142] *Field Intel.*, 49 F.4th at 356–58.

[143] *Willie Gary*, 906 A.2d at 78, 79 (defining the issue of substantive arbitrability as "a dispute over the scope of an arbitration provision," and identifying it as a "threshold question regarding the validity of an arbitration agreement"); *accord Field Intel.*, 49 F.4th at 356, 358 (explaining a dispute about whether an agreement exists and whether there is "[an] agreement for [the court] to enforce" is more primary than a dispute about whether "[an] agreement had terminated or was invalid" and that "[c]ourts retain the primary power to decide questions of whether the parties mutually assented to a contract").

41

There was no evidence the *BuzzFeed I* plaintiffs had any intention to arbitrate;[144] they were "not parties to the Employment Agreements"[145] and they "did not enter into arbitration agreements with [d]efendants."[146] The judgment did not depend on *BuzzFeed I*'s substantive arbitrability determination. It was entered on a more fundamental question than the intent to delegate arbitrability: whether the *BuzzFeed I* plaintiffs had any intent to arbitrate at all.

BME is not estopped from arguing the OAs together with the EAs "prevent the court from finding clear and unmistakable evidence of intent to arbitrate arbitrability."[147]

### b. The EAs Delegate Substantive Arbitrability.

BME argues the Court should decide substantive arbitrability because the EAs' intention to delegate that question is muddied by the OAs and Parent's charter. According to BME, the Employees' arbitration claims "arise out of and are governed by the [Parent's] [c]harter" or otherwise "implicate . . . the Stock Option

---

[144] *Fairstead*, 288 A.3d at 746, 753 ("[T]he contract formation issue involves whether [the parties] are parties to the Employment Arbitration Agreement. A contract only exists between parties to the agreement."); *BuzzFeed I*, 2022 WL 15627216, at *14 ("[A]ny evidence of intent in those [a]greements cannot be imputed to [p]laintiffs . . . [and] [d]efendants do not cite any authority in support of the proposition that paying fees that were due before answering the arbitration petition, alone, constitutes an intent to arbitrate . . . .").

[145] *BuzzFeed I*, 2022 WL 15627216, at *2.

[146] *Id.* at *18.

[147] PAB 24 (quoting *Fairstead*, 288 A.3d at 758).

Agreements."[148]  As a reminder, some of the OAs contain forum selection clauses or are otherwise silent as to arbitration.[149]  The Parent's charter contains a forum selection clause mandating litigation in Delaware's state courts, unless Parent consents in writing to the selection of an alternative forum.[150]  And the EAs mandate arbitration of generally all disputes under the AAA rules.  BME argues these provisions mean substantive arbitrability is for the Court, pointing to *Fairstead* and *Kokorich v. Momentus*.[151]  BME's argument has two flaws:  it misapplies those cases, and it improperly characterizes Employees' claims as arising out of a different agreement.

*Fairstead* and *Kokorich* do not shift substantive arbitrability to the Court simply because the claims under the EAs are brought in the context of the OAs and the Parent Charter.  They stand for the proposition that when the arbitration petition is brought according to the terms of an arbitration provision in one agreement, with a claim expressly invoking or relying on another arbitration-free agreement, the

---

[148] POB 39, 41.

[149] *See*, *e.g.*, D.I. 34, Ex. 3 Part 12 at Ex. 3.77 at Stock Option Agreement § 14.7.

[150] D.I. 39, Ex. 11 art. 10.

[151] PAB 23 ("[T]his Court has since issued two decisions—*Fairstead* and *Kokorich*—which have changed the legal context surrounding the issue of conflicting clauses and call for this Court to reexamine this issue."); *see Fairstead*, 288 A.3d 729; *Kokorich*, 2023 WL 3454190.

Court addresses whether a governing arbitration agreement exists for the claim.[152]

Both cases involve an arbitration petition asserting the arbitrator's jurisdiction under one agreement with an arbitration provision, while also expressly invoking other agreements lacking an arbitration provision.[153] Both rely on and unremarkably follow precedent addressing arbitral claims invoking arbitration-free agreements.[154] In that context, the *Willie Gary* test is meaningless for the agreement that does have an arbitration provision, and inapplicable for the agreement that does not.[155]

---

[152] *Fairstead*, 288 A.3d at 744–45, 758; *Kokorich*, 2023 WL 3454190, at *6 (noting the plaintiff's claims under one agreement and a set of bylaws "ha[ve] no relationship to the agreement containing the arbitration provision" and deciding the claims were not arbitrable); *TowerHill*, 2008 WL 4615865, at *1, *3; *Hough Assocs.*, 2007 WL 148751, at *6, *11; *see supra* notes 111, 117, 185.

[153] *Fairstead*, 288 A.3d at 744–45 (stating most of the arbitration claims expressly rely upon the agreements that lack an arbitration provision); *Kokorich*, 2023 WL 3454190, at *5 (discussing the relevant agreements that would be expressly named in the proposed arbitration petition and explaining two of the three agreements lack an arbitration provision).

[154] *Fairstead*, 288 A.3d at 758 ("[W]here there are various dispute resolution clauses in play in various contracts, it is impossible to select one and say it applies generally to all disputes." (quoting *TowerHill*, 2008 WL 4615865, at *3); *id.* (holding the "competing forum provisions prevent the court from finding clear and unmistakable evidence of an intent to arbitrate arbitrability"); *Kokorich*, 2023 WL 3454190, at *5 n.44 (first citing *Hough Assocs.*, 2007 WL 148751, at *11–13; then quoting *UPM-Kymmene*, 2017 WL 4461130, at *6 ("In *Hough Associates* . . . the Court quickly discerned the absence of a clear and unmistakable intention to have an arbitrator decide issues of substantive arbitrability when the contract containing the arbitration clause was in obvious tension with the contract(s) that formed the basis of the claims."))).

[155] *See Henry Schein*, 586 U.S. at 69–70 ("[I]f a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue."); *Willie Gary*, 906 A.2d at 79 (indicating the *Willie Gary* test unremarkably only applies to an arbitration agreement and not to an agreement lacking an arbitration agreement, because validity follows existence); *see also Fairstead*, 288 A.3d at 758;

*Fairstead* indicates its conclusion would be different if the arbitration petition did not expressly invoke the other agreements lacking arbitration provisions.[156] *Fairstead* and *Kokorich* do not support the Court's assumption of substantive arbitrability where the claim is not expressly under an arbitration-free agreement. They do not support that assumption here.

BME's second error is in insisting that the arbitration claims would be better pled as "[s]tockholder [c]laims under the [c]harter, not the Employment

*Kokorich*, 2023 WL 3454190, at *5. In *Kokorich*, the plaintiff expressly sought indemnification from an indemnification agreement and bylaws, neither of which contained an agreement to arbitrate. For those agreements, an agreement to arbitrate did not exist, and "no arbitration may be compelled in the absence of an agreement to arbitrate." *Field Intel.*, 49 F.4th at 358. *Willie Gary*'s test for who decides arbitrability was inapplicable. *Willie Gary*, 906 A.2d at 79.

But before I reached that conclusion, I engaged in a *Willie Gary* analysis and concluded substantive arbitrability was for the Court. The defendant had moved to dismiss on the grounds that the plaintiff's claims arose from a second amendment to a separation agreement that contained an arbitration provision, which delegated substantive arbitrability to the arbitrator. *Kokorich*, 2023 WL 3454190, at *4; *Kokorich v. Momentus Inc.*, C.A. No. 2022-0722-MTZ, D.I. 29 at 39 (Del. Ch. Oct. 14, 2022); *Kokorich v. Momentus Inc.*, C.A. No. 2022-0722-MTZ, D.I. 53 at 15 (Del. Ch. Jan. 26, 2023). The parties dedicated significant pages and effort to *Willie Gary*, with the plaintiff dedicating an entire answering brief and defendant an entire reply brief to the "who decides" inquiry. *See Kokorich v. Momentus Inc.*, C.A. No. 2022-0722-MTZ, D.I. 35 (Del. Ch. Nov. 14, 2022); *see also Kokorich v. Momentus Inc.*, C.A. No. 2022-0722-MTZ, D.I. 40 (Del. Ch. Dec. 2, 2022). And so, I began my analysis of the defendant's motion with the question of substantive arbitrability, then turned to the existence of an agreement to arbitrate. *Kokorich*, 2023 WL 3454190, at *5. I would structure the opinion differently today, but the outcome would still be the same.

[156] *Fairstead*, 288 A.3d at 758, 761.

Agreements."[157]  From there, BME contends that claims under the charter are not arbitrable.[158]  But the EA Defendants' arbitration petition simply does not invoke the charter or the OAs.  This Court has consistently refused to entertain this sort of argument.[159]

At bottom, BME has invited this Court to adjudicate substantive arbitrability by first impermissibly recasting the EA Defendants' arbitration claim as arising out of a different agreement, then arguing no agreement to arbitrate exists.  But the arbitration petition does not invoke the charter or the OAs.  And even if it turns out the EAs cannot support the claims as pled, courts may not ignore a delegation of arbitrability even if the arbitration claims as pled appear to be wholly groundless.[160]  The EA parties agreed that an arbitrator must determine whether the claims are

---

[157] PAB 31; POB 23–24 ("Defendants' claims are not arbitrable . . . .  Here, Defendants' Amended Stockholder Claims fall under the [Parent] Charter, not the alleged Employment Agreements, and any purported claim regarding stock options falls under Defendants' . . . Option Agreements, which do not contain arbitration clauses.").

[158] D.I. 55 at 22 (BME counsel explaining the defendants should be asserting claims against Parent under the Charter); *id.* at 19 (BME counsel stating the arbitration claims though pled as under the EAs "are truly arising under the charter of the publicly owned parent").

[159] *Li*, 2013 WL 1286202, at *1–3, *6–9; *Legend Nat. Gas*, 2012 WL 4481303, at *2, *5–6, *9; *Orix LF, LP v. Inscap Asset Mgmt, LLC*, 2010 WL 1463404 (Del. Ch. Apr. 13, 2010).

[160] *See, e.g.*, *Henry Schein*, 586 U.S. at 68 ("When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract.  In those circumstances, a court possesses no power to decide the arbitrability issue.  That is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless.").

46

arbitrable. Despite its best efforts, BME has offered no basis for this Court to disrupt that clear and unmistakable delegation.

The EA Defendants' Rule 12(b)(1) motion to dismiss is granted. Because Plaintiff's claims against the EA Defendants are dismissed, I must deny its motion for summary judgment.

### C. The Remaining Six Employees

The ninety-one Employees have produced only eighty-five employment agreements. The Six Employees have not produced an EA that they signed.[161] This complicates their attempt to dismiss this action in favor of arbitration. The Six Employees cannot secure dismissal in favor of arbitration as they have fallen short of demonstrating an agreement to arbitrate. But that present deficiency does not justify a summary judgment precluding arbitration either. Plaintiff has fallen short of demonstrating the Six Employees will be unable to prove an agreement to arbitrate exists.

### 1. Six Employees Have Not Established An Agreement To Arbitrate.

Even in the absence of arbitration agreements, the Six Employees seek to dismiss this action in favor of arbitration. They argue their agreements to arbitrate should be "presumed to exist" because (i) the Six Employees and OldCo proceeded

---

[161] *See* DRB 2 ("There is . . . no dispute that the parties have located employment agreements containing arbitration clauses that bind BME for 85 of the 91 Defendants.").

as if those Six Employees had employment agreements, so (ii) BME is estopped from denying employment agreements exist for those Six Employees, and (iii) the eighty-five other EAs demonstrate OldCo assented to the arbitral forum for disputes arising out of employment agreements, so (iv) the Six Employees' presumed employment agreements include standard arbitration provisions.[162]

The "party seeking to enforce an arbitration agreement" bears the "burden of establishing [its existence]."[163] Thus, the question is not whether BME can deny an arbitration agreement exists; it is whether the Six Employees can prove to this Court it does.[164] The Six Employees must show objective and overt manifestations of mutual assent to arbitrate. "[A]rbitration 'is a consensual proceeding, and the court may not require arbitration unless the parties have a contract to arbitrate.'"[165] There must be proof of clearly expressed mutual assent to arbitration.[166] "When the very

---

[162] DOB 34; DRB 2.

[163] *Donofrio v. Peninsula Healthcare Servs., LLC*, 2022 WL 1054969, at *4 (Del. Super. Apr. 8, 2022).

[164] *Skinner v. Peninsula Healthcare Servs., LLC*, 2021 WL 778324, at *3 (Del. Super. Mar. 1, 2021) ("In determining whether an agreement to arbitrate exists, ordinary state-law contract principles apply. Under Delaware law, contract formation requires mutual assent, meaning a complete meeting of the minds of the parties. Whether the parties mutually assented should be determined objectively, based on overt manifestations of assent rather than subjective intent. No agreement to arbitrate exists unless there is a clear expression of such an intent.").

[165] *Milton Invs.*, 2010 WL 2836404, at *5 (quoting *Brown v. T-Ink, LLC*, 2007 WL 4302594, at *10 (Del. Ch. Dec. 4, 2007)).

[166] *Lester Bldg. Assocs. Inc. v. Davidson*, 514 A.2d 1100, 1102 (Del. Ch. 1986); *Skinner*, 2021 WL 778324, at *3.

existence of . . . an arbitration agreement is disputed, a [trial] court is correct to refuse to compel arbitration until it resolves the threshold question of whether the arbitration agreement exists."[167]

The parties do not dispute that an employment agreement existed for the Six Employees.[168] But the mere existence of those employment agreements is insufficient to demonstrate OldCo's assent to arbitrate.[169] When a "broader contract contains an agreement to arbitrate controversies that bear some level of relationship to the contract," the agreement to arbitrate is considered separate and severable from that broader contract.[170] "[A]ny contract that contains an arbitration clause is, in fact, two contracts: (1) a contract to arbitrate disputes and (2) the overarching container contract."[171] Even when the container contract is undisputedly valid,

---

[167] *Guidotti v. Legal Helpers Debt Resol., L.L.C.*, 716 F.3d 764, 774 n.5 (3d Cir. 2013) (quoting *Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99, 112 (3d Cir. 2000)); *accord Granite Rock*, 561 U.S. at 296 ("[A] court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate that dispute . . . . [And] [t]o satisfy itself that such agreement exists, the court must resolve any issue that calls into question the formation or applicability of the specific arbitration clause.").

[168] PAB 29 ("This argument conflates the existence of an employment relationship—which BME does not deny—with the existence of a contractual agreement to arbitrate, which Defendants have failed to establish.").

[169] DRB 2.

[170] *Fairstead*, 288 A.3d at 747.

[171] *Id.* at 747 n.8 (quoting David Horton, *Arbitration As Delegation*, 86 N.Y.U. L. Rev. 437, 449 (2011)).

courts still require proof of a valid agreement to arbitrate.[172]  Because an employment agreement is distinct from an agreement to arbitrate that may appear within the employment agreement, the Six Employees cannot point to an employment agreement and call it an agreement to arbitrate.  Standing alone, OldCo's employment relationship with the Six Employees, and a presumed employment agreement, fail to establish OldCo's intent to arbitrate.

And so, to establish that intent, the Six Employees argue the eighty-five other EAs prove OldCo employment agreements consistently included a standard agreement to arbitrate.[173]  BME insists the Six Employees must prove OldCo's intent to arbitrate by producing "an arbitration agreement" with each of the Six Employees.[174]  In so many words, the parties dispute whether the Court can use parol evidence to conclude that a party entered a written agreement to arbitrate when an existing container agreement is lost or missing.

---

[172] *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 (2006) ("Challenges to the validity of arbitration agreements upon such grounds as exist at law or in equity for the revocation of any contract can be divided into two types.  One type challenges specifically the validity of the agreement to arbitrate.  The other challenges the contract as a whole." (internal quotation marks omitted)); *Granite Rock*, 561 U.S. at 296–97 (2010) (explaining whether an arbitration agreement was ever created is distinguishable from whether a contract containing an arbitration clause "was illegal when formed" (citing *Buckeye*, 546 U.S. at 444)); *see also Kuhn*, 990 A.2d at 396 ("We will not enforce a contract that unclearly or ambiguously reflects the intention to arbitrate.").

[173] DOB 34; DRB 2 ("[A]ny such agreement would be substantially identical to the other 85 contracts to which every single one of their contemporaneous co-workers was a party.").

[174] POB 47–48.

The Six Employees do not need to produce their EAs in order to resolve whether those contracts contain an agreement to arbitrate. Hornbook principles permit the existence and terms of a missing contract to be proven by parol evidence, so long as it is clear and convincing.[175] "Parol evidence may be admitted to prove the making of a contract . . . and to prove a collateral or separate agreement.' [And] [t]he parties' performance or course of dealing is relevant to show the parties' intent."[176] When the parties cannot produce an "underlying agreement, if arbitration

---

[175] *Rennick v. N. Md. Corp.*, 1989 WL 12239, at *4 (Del. Super. Feb. 9, 1989); *accord Cerberus Intern., Ltd. v. Apollo Mgmt*, L.P., 794 A.2d 1141, 1151 (Del. 2002) (discussing contract reformation and the requirement that there be clear and convincing evidence expressing the "real agreement" of the parties involved); *EDIX Media Grp., Inc. v. Mahani*, 2006 WL 3742595, at *13 (Del. Ch. Dec. 12, 2006) (finding plaintiff met its burden with third-party documentary evidence, and noting, "I do not believe (as defendant suggests) that plaintiff must put forward a signed contract in order to prove that a contractual relationship existed"); *Estate of Carpenter v. Dinneen*, 2007 WL 2813784, at *5 (Del. Ch. Apr. 11, 2007) (considering course of conduct and payment structure between alleged employer and alleged employee to determine no employment contract existed); *see also Gomes v. Karnell*, 2016 WL 7010912, at *3 (Del. Ch. Nov. 30, 2016) ("In determining if an 'overt manifestation of assent' occurred, the Court considers whether a reasonable person would conclude that the parties intended to be bound by examining the assent as well as all of the surrounding circumstances, including the course and substance of negotiations, prior dealings, customary practices in the trade, and the formality and completeness of the document." (quoting *Leeds v. First Allied Conn. Corp.*, 521 A.2d 1095, 1101 (Del. Ch. 1986))).

[176] *Finger Lakes Cap. P'rs, LLC v. Honeoye Lake Acq., LLC*, 2015 WL 6455367, at *15 (Del. Ch. Oct. 26, 2015) (quoting *Scott-Douglas Corp. v. Greyhound Corp.*, 304 A.2d 309, 315 (Del. Super. 1973)), *aff'd in part, rev'd in part on other grounds*, 151 A.3d 450 (Del. 2016).

is to be compelled, [the Court] has to look elsewhere for a binding agreement between the parties to go to arbitration."[177]

As far as I can tell, Delaware precedent offers no benchmark as to what parol evidence may establish clear and convincing evidence that a missing contract contains an agreement to arbitrate. Federal persuasive authority applies "ordinary state-law principles of contract law."[178] The United States Courts of Appeals for the Third and Fifth Circuits have stated that "in most cases," supporting affidavits "should be sufficient . . . to determine whether there was a meeting of the minds on the agreement to arbitrate."[179] In *Hill v. Employee Resource Group, LLC*, the Fourth Circuit refused to compel arbitration when the arbitration agreement was lost or

---

[177] *Sandvik AB v. Advent Intern. Corp.*, 220 F.3d 99, 108 (3d Cir. 2000).

[178] *Aliments Krispy Kernels, Inc. v. Nichols Farms*, 851 F.3d 283, 288 (3d Cir. 2017) ("[W]e repeatedly made clear that . . . 'when determining whether there is a valid agreement to arbitrate between the parties . . . we apply ordinary state-law principles of contract law,' and no more." (quoting *Century Indemnity Co. v. Certain Underwriters at Lloyd's London*, 584 F.3d 513, 532 (3d Cir. 2009))).

[179] *Guidotti*, 716 F.3d at 778 (vacating the order denying arbitration when the record before the lower court was insufficient to prove there was no genuine dispute of material fact regarding a meeting of the minds over an agreement to arbitrate and requiring the lower court to undertake a limited discovery); *accord Banks v. Mitsubishi Motors Credit of Am.*, 435 F.3d 538, 540–541 (5th Cir. 2005) (holding a party attempting to enforce a lost or destroyed arbitration agreement may use affidavit evidence to demonstrate the existence of the agreement); *see also Lemus v. CMH Homes, Inc.*, 798 F. Supp. 2d 853, 861 (S.D. Tex. 2011) (holding the defendants met their burden by clear and convincing parol evidence that the defendants entered a standard installment contract and an arbitration agreement existed by producing two affidavits from custodians of the business records and by other testimonial admissions that a closing transaction occurred and that standard retail installment contracts contained a binding arbitration provision).

missing, concluding that an affidavit from the company's director of human resources attesting to the entity's corporate policy requiring all employees to enter arbitration agreements as a condition of their employment, and 780 employee arbitration agreements, was not clear and convincing evidence of an agreement to arbitrate with other employees.[180] The Fourth Circuit concluded the director of human resources was too removed from "the onboarding process" to know whether the company's arbitration policy was strictly enforced as to the plaintiffs.[181] It also explained that the 780 employee arbitration agreements were only the numerator, and that the company did not provide any context as to "the number of signed arbitration agreements versus the number of employees onboarded for the relevant period."[182] And, the "numerator is of scant value without a denominator."[183]

*Hill* is the most persuasive authority I could find. Its facts are analogous, and it provides a specific threshold for clear and convincing evidence to be supplied by a party seeking to compel arbitration under a missing or lost agreement. Here, the Six Employees have supplied the numerator—eighty-five EAs with an agreement to arbitrate—but they have not supplied the denominator. They have not shown how many employees were hired in the relevant time periods. They have not supplied

---

[180] *Hill v. Empl. Res. Grp., LLC*, 816 Fed.Appx. 804, 809 (4th Cir. 2020).

[181] *Id.*

[182] *Id.*

[183] *Id.*

any affidavit, let alone one addressing OldCo's onboarding processes in general or for the Six Employees. The Six Employees have not established by clear and convincing evidence that their employment agreements contained an agreement to arbitrate.

The Six Employees contend that the missing agreements "can easily and efficiently be handled during the arbitration process, where an arbitrator can conduct a hearing, take evidence, and then determine whether BME and those 6 employees agreed to arbitrate."[184] But the existence of an agreement to arbitrate is an issue for judicial determination, not an arbitrator.[185] The arbitrator has no authority to conduct a hearing or take evidence without an agreement granting such authority.

The Employees' motion is denied as to the Six Employees, as they have failed to demonstrate the existence of an agreement to arbitrate.

### 2. Plaintiff Has Not Demonstrated The Six Employees Cannot Prove An Agreement To Arbitrate.

With the Employees' motion to dismiss denied for the Six Employees, I now turn to BME's motion for summary judgment as against those six. "A motion for summary judgment requires the Court to examine the record to determine whether

---

[184] DRB 2.

[185] *Henry Schein*, 586 U.S. at 69 ("[B]efore referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists."); *Gandhi-Kapoor*, 307 A.3d at 356–57 (explaining "[a] court must . . . always address challenges to the existence of the arbitration agreement" because "whether the agreement to arbitrate still exists . . . is a proper issue for the court" (internal quotation marks omitted)); *Kuhn*, 990 A.2d at 396.

54

there are any genuine issues of material fact or whether the evidence is so one-sided

that one party should prevail as a matter of law."[186]  The facts must be viewed in the

light most favorable to the nonmoving party, and the moving party has the burden

of demonstrating that no material question of fact exists.[187]  "There is no 'right' to a

summary judgment," and "the existence of factual disputes make [a] case an

inappropriate one for summary judgment in favor of either party."[188]  And so,

summary judgment will not be granted "when the legal question presented needs to

be assessed in" a more developed factual record,[189] or "where it seems prudent to

---

[186] *Guy v. Jud. Nominating Com'n*, 659 A.2d 777, 780 (Del. Super. 1995) (citing *Burkhart v. Davies*, 565 A.2d 558, 560 (Del. 1989)).

[187] *Weil v. VEREIT Operating P'ship, L.P.*, 2018 WL 834428, at *3 (Del. Ch. Feb. 13, 2018).

[188] *Telxon Corp. v. Meyerson*, 802 A.2d 257, 262 (Del. 2002) (explaining a party is not "entitled" to summary judgment and that "[a] trial court's denial of summary judgment is entitled to a high level of deference and is, therefore, rarely disturbed"); *AeroGlobal Cap. Mgmt, LLC v. Cirrus Indus.*, 871 A.2d 428, 443 (Del. 2005).

[189] *Trustwave Hldgs., Inc. v. Beazley Ins. Co., Inc.*, 2024 WL 1112925, at *8 (Del. Super. Mar. 14, 2024) ("The 'Court may not be able to grant summary judgment 'if the factual record has not been developed thoroughly enough to allow the Court to apply the law to the factual record.'" (quoting *Radulski v. Liberty Mut. Fire Ins. Co.*, 2020 WL 8676027, at *4 (Del. Super. Oct. 28, 2020))); *Those Certain Underwriters at Lloyd's London v. Nat'l Installment Ins. Servs., Inc.*, 2007 WL 1207106, at *8 (Del. Ch. Feb. 8, 2007) ("Summary judgment will be denied when the legal question presented needs to be assessed in the 'more highly textured factual setting of a trial.'" (quoting *Schick Inc. v. Amalgamated Clothing & Textile Workers Union*, 533 A.2d 1235, 1239 n.3 (Del. Ch. 1987)); *id.* ("[T]here are questions of law which need further elucidation in the more factually developed context . . . .").

make a more thorough inquiry into the facts."[190] It is particularly improper when the party seeking it "essentially controls the relevant information material[] to the issue" the court is asked to decide.[191] And, where "questionable record keeping" has "contributed to the difficulty in determining [the legal question]," this Court has said it is "not prepared to rule as a matter of law . . . that [the nonmoving party] cannot prove" the missing records by using an approach other than document production.[192] In short, "[a]ny application for such a judgment must be denied if there is any reasonable hypothesis by which the opposing party may [succeed]."[193]

This matter is at the pleading stage, and the pleadings rely on the employment agreements that the Employees could locate.[194] "Depositions and other discovery

---

[190] *Trustwave*, 2024 WL 1112925, at *8; *Underwriters at Lloyd's London*, 2007 WL 1207106, at *8 ("The Court 'maintains the discretion to deny summary judgment if it decides that a more thorough development of the record would clarify the law or its application.'" (quoting *Tunnell v. Stokley*, 2006 WL 452780, at *2 (Del. Ch. Feb. 15, 2006))); *Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del. 1962) ("Under no circumstances . . . will summary judgment be granted when . . . it seems desirable to inquire thoroughly into the[] [facts] in order to clarify the application of law to the circumstances.").

[191] *Mann v. Oppenheimer & Co.*, 517 A.2d 1056, 1061 (Del. 1986).

[192] *Underwriters at Lloyd's London*, 2007 WL 1207106, at *10–11 (acknowledging the nonmoving party did not maintain "'claims' files for losses . . . through which to process claims" for damages and that its recordkeeping polices contributed to the difficulty in determining damages, but denying summary judgment for failure to show damages because the moving party could not prove as a matter of law that the nonmoving party would be unable to show damages through the testimony of an accounting expert).

[193] *Vanaman v. Milford Mem'l Hosp., Inc.*, 272 A.2d 718, at 720 (Del. 1970).

[194] D.I. 34, Aff. ¶¶ 7–8 ("At my direction, a review of OldCo's records was conducted to search for Employment Agreements between Defendants and OldCo. . . . The review was

have not been taken.  Indeed, some of the Court's understanding is based upon representations by Delaware attorneys who were not present for the[] [employment] negotiations and were subsequently tasked with filling in the blanks in a record that has not been fleshed out."[195]  "That alone gives the Court pause" in granting summary judgment.[196]

And so, an issue of material fact persists as to whether an agreement to arbitrate can be shown to exist for the Six Employees.[197]  Can the Six Employees' employment agreements be located?  The Six Employees insist the agreements can

_____

unable to locate an Employment Agreement for six of the Defendants who did not submit individual Employment Agreements in the Arbitrations.  . . .  [But] a review of OldCo's records was conducted to search for Stock Option Agreements between Defendants and OldCo[, and] . . . [that review] located Stock Option Agreements for all 91 Defendants . . . ."); POB 15.

[195] *Brechner v. Phx. Network Sols. LLC*, 2017 WL 5953517, at *3 (Del. Super. Dec. 1, 2017); *see* DOB 34 ("[O]wing to the vagaries of modern life, no party can locate the employment agreements for six of the 91 Employee Defendants."); *id.* (stating BME could not "deny[] the existence of any Employment Agreements" because "OldCo contracted with Employee Defendants, accepted the work provided to it by its Employees, and paid them accordingly, proceeding at all times in a manner consistent with its acknowledgement of the Employment Agreements" and OldCo used a "standard arbitration clause"); *see also* PAB 29 ("There are Six Employees who have failed to produce an arbitration agreement and for whom BME has not located any such agreement. For those Defendants, there is no evidence of an agreement to arbitrate, much less an agreement to delegate arbitrability to an arbitrator.").

[196] *Brechner*, 2017 WL 5953517, at *3.

[197] PAB 29 ("[T]here is *no* evidence of an agreement to arbitrate."); *but see* D.I. 18 ¶ 32 ("Defendants admit that certain of these Employment Agreements are not in Defendants' possession, custody, or control; [but] . . . on information and belief, Plaintiff (or a corporate affiliate or parent of Plaintiff) possesses all of Defendants' Employment Agreements . . . .").

be found;[198] BME insists that "despite a diligent search, BME is *not* in possession of those Defendants' Employment Agreements."[199] Even if the agreements cannot be found, as explained, it is possible to prove an intent to arbitrate with clear and convincing parol evidence. Did OldCo intend to arbitrate, or not? The Six Employees insist it did;[200] BME insists the Six Employees have not proven it at the pleading stage.[201] BME has not established, before discovery has begun, that the Six Employees cannot prove the missing agreements contained a standard arbitration provision. BME has not demonstrated OldCo did not agree to arbitrate with the Six Employees, and it has not proven that there is no evidence of an agreement to arbitrate. And so, at this stage, it remains possible that the Six Employees will be able to produce either direct or indirect evidence establishing an agreement to arbitrate.

Plaintiff's motion for summary judgment is denied for the Six Employees. I leave to the Defendants to determine whether the EA Defendants will wait to proceed with arbitration pending the development of the record for the Six Employees; I also leave to BME as to whether, in light of this opinion, it still objects to arbitration with

---

[198] D.I. 18 ¶ 32.

[199] POB 15; D.I. 34, Aff. ¶¶ 7–8.

[200] DOB 34; DRB 2.

[201] POB 47; PAB 29–30.

the Six Employees.  If it does, the parties should submit a stipulated scheduling order for the remainder of the case.

## III.  CONCLUSION

The motion to dismiss is GRANTED for the EA Defendants.  The motion to dismiss is DENIED as to the Six Employees.  The motion for summary judgment is DENIED.  The parties shall submit an implementing order and a joint stipulated scheduling order for the remainder of the case.